(C.D. 2624)

BORNEO SUMATRA TRADING CO., INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided March 3, 1966)

*Sharp, Solter & Hutchison* (*Myron Solter, James R. Sharp,* and *Alan D. Hutchison* of counsel) for the plaintiff.
*John W. Douglas,* Assistant Attorney General (*Harold L. Grossman,* trial attorney), for the defendant.

Before OLIVER, WILSON, and NICHOLS, Judges

NICHOLS, Judge: The merchandise involved in these cases, consolidated at the trial, is described on the invoices as crown board or crown wall board, hardboard coated with lauan skins. It was imported from Japan in 1958 and 1959 and was assessed with duty at 20 per centum ad valorem under paragraph 405 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement

on Tariffs and Trade, T.D. 52739, as plywood. It is claimed in the protests that the merchandise is properly dutiable at 12½ per centum ad valorem under paragraph 1403 of said tariff act (as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, T.D. 54108), as manufactures of pulp, not specially provided for.

These provisions of the tariff act, as modified, read as follows:

[Par. 405, as modified by T.D. 52739, *supra.*] Plywood (except alder red pine (*pinus sylvestris*), and Spanish cedar plywoods and plywood with face ply of Western redcedar (*thuja plicata*)):
    Other_____ 20% ad val.

| [Par. 1403, as modified by T.D. 54108, *supra.*] Manufactures of pulp, not specially provided for__ | A *** | B *** | C 12½% ad val. |
|---|---|---|---|

An allegedly pertinent section of the Customs Regulations reads as follows:

16.10a Tariff classification of prospective imports.—(a) Any prospective importer or foreign exporter may apply in writing to the Commissioner of Customs, Washington 25, D.C., for a ruling as to the tariff classification of any article which he intends to import into or ship to the United States in commercial quantities. The application shall contain a full description of each article. The application shall also give the following information, unless it is clear that it will be of no value in determining the tariff classification of the article: (1) the respective quantities and values of the component materials of which the article is composed; (2) information as to its chief use and commercial designation in the United States; and (3) any specifications, analyses, or other information deemed necessary to a tariff classification of the article. Whenever practicable, a sample of the article should be submitted with the application.

(b) If the Commissioner is satisfied (1) that the application is made in good faith by an importer or foreign exporter who is properly and directly concerned with the tariff classification of the article described; (2) that the information submitted or otherwise available is adequate for a considered decision; and (3) that the ruling applied for is not already covered by a controlling published decision, the Commissioner will rule on the tariff classification of the article. A copy of the decision will be mailed to the applicant. The decision will be published in the weekly Treasury Decisions if it will affect a substantial volume of imports or if it is for any other reason of sufficient importance to justify such publication.

(c) Any decision published pursuant to paragraph (b) shall be deemed to establish a uniform practice within the meaning of section 315(d), Tariff Act of 1930, as amended. The decision will not be

changed by a further ruling of the Commissioner to impose higher duties on such an article unless the prior decision should prove to be clearly wrong. When it appears to the Commissioner that a correct interpretation of the law may require such a ruling, notice that the prior ruling is under review will be published in the Federal Register so that the parties in interest will have an opportunity to make such written submissions as they desire, within a period which will be specified in the notice, with respect to the correctness of the contemplated action. If after the consideraton of such submissions as may be received the Commissioner issues a ruling imposing higher duties, it will be effective only as to merchandise entered for consumption or withdrawn from warehouse for consumption on or after the expiration of 90 days after the date of publication of such ruling in the weekly Treasury Decisions.

(d) The notice procedure outlined in paragraph (c) will be applied also in any other case in which the Commissioner believes that a correct interpretation of the law may require the issuance of an administrative ruling imposing higher duties on an imported article than has been assessed under an established and uniform practice. (Secs. 315, 502, 46 Stat. 695, as amended, 731; 19 U.S.C. 1315, 1502.)

At the trial, counsel for the respective parties stipulated as follows (plaintiff's collective exhibit 1):

IT IS STIPULATED AND AGREED, by and between counsel for Plaintiff herein and the Assistant Attorney General, counsel for the United States, subject to the approval of the Court, as follows:

1. That the merchandise covered by the subject protest consists of standard hardboard with a lauan veneer laminated to both sides thereof, and commonly known in the commerce and industry of the United States as a special construction of plywood;

2. That upon application by an interested importer, and under the authority of section 16.10a (a) and (b) of the Customs Regulations, the Commissioner of Customs caused a ruling bearing the designation "Treasury Decision 54648(7)" to be issued by publication in the weekly Treasury Decisions, Vol. 93, No. 31, on July 31, 1958, which reads as follows:

"(7) Hardboard, wood veneered, if in chief value of veneer, classifiable as a manufacture in chief value of wood, not specially provided for, under paragraph 412, Tariff Act of 1930; if in chief value of hardboard, classifiable as a manufacture of pulp, not specially provided for, under paragraph 1403. Bureau telegram dated July 22, 1958."

And further that the merchandise referred to in the said T.D. 54648(7) and the Bureau telegram dated July 22, 1958, was in fact hardboard veneered on one side only.

3. That no subsequent ruling changing, modifying, amending, or explaining T.D. 54648(7) has been issued by the Commissioner of Customs by publication in the weekly Treasury Decisions or in the Federal Register;

4. That the Commissioner of Customs caused to be transmitted internally to all Customs Officers the following pertinent instructions or clarifications to the said T.D. 54648 (7) : CIE 1152/58; CIE 1741/57; and CIE 1662/58, and that annexed hereto are photostatic copies of the said CIE's which the parties hereto agree may be received in evidence;

5. That the plaintiff herein has never applied to the Secretary of the Treasury for a classification ruling pursuant to section 315 (d), Tariff Act of 1930, and section 16.10a (a) and (b) of the Customs Regulations with respect to the subject merchandise;

6. That should the Court find that the subject merchandise is not properly classified as hardboard, wood veneered within the meaning of the said T.D. 54648 (7) or that the said T.D. 54648 (7) does not apply to the classification of the subject merchandise, the said merchandise is properly classified as plywood under paragraph 405 of the Tariff Act of 1930, as amended.

There were received in evidence samples representative of the imported merchandise with respect to its ply, though not with respect to its size. The merchandise covered by protest 61/17396 was in door sizes and that covered by protests 63/6296 and 63/6297 was in panel sizes. The plies and thicknesses of the samples are as follows:

| Exhibit 3 | 3 ply | $1/8''$ | thick |
| Exhibit 4 | 3 ply | $3/16''$ | thick |
| Exhibit 5 | 5 ply | $3/16''$ | thick |
| Exhibit 6 | 3 ply | $1/4''$ | thick |
| Exhibit 7 | 5 ply | $1/4''$ | thick |

There was also received in evidence a deposition of Yoshizo Masuzawa, Director in Charge of General Affairs and Representative Director of Masuzawa Plywood Industry Co., taken in the Tokyo District Court in Japan, with translations. (Plaintiff's collective exhibit 2.) The witness stated that he had participated in the manufacture of merchandise such as that involved herein; that its trade name is "Crownboard," and that it is composed of hardboard cores with lauan veneers on the face and back. It is manufactured as follows:

We cut the log on a lathe [1] into veneers for use as the surfaces. Hardboard is inserted in between the veneers, and these components are bonded together by a resinous substance and pressed into a solid panel.

It is manufactured in 3 or 5 plies and of various thicknesses. The cores were purchased from Tokyo Hardboard Co. and were cut to size and sanded before use in the production of crownboard. Wood was purchased from various sources, usually in the form of logs. The

---

[1] "Lathe" was corrected to read "blade" at the trial.

witness refused to give the unit costs of the component materials, but gave the cost to his company during the period May 1958 to February 1960 in percentages, taking the total cost as 100 percent, as follows:

| Merchandise | | | Core | Veneers | Resin |
|---|---|---|---|---|---|
| $\frac{1}{8}''$ | 3 ply | | 54 % | 18.8% | 8.5% |
| $\frac{3}{16}''$ | 3 ply | | 58.5% | 19.3% | 8.3% |
| $\frac{1}{4}''$ | 3 ply | | 58.6% | 21.2% | 8 % |
| $\frac{3}{16}''$ | 5 ply | | 44.3% | 30.8% | 13.3% |
| $\frac{1}{4}''$ | 5 ply | | 36 % | 31.1% | 11.5% |

Defendant called W. Douglas Macdonald, Manager of Technical Service of United States Plywood Corp. His office handles practically every type of plywood commercially known in the United States, and he is familiar with the trade identifications of the plywood industry and the nomenclature used in the trade. He was shown exhibit 3 and stated that it was plywood within his personal experience and would be so handled commercially. He was shown an article described as hardboard veneered on one side only, and he stated that it was not plywood. He testified that in his experience hardboard veneered on one side only is not referred to or known or recognized in the plywood industry as plywood; that it would be considered a substrate or base layer which is veneered or overlaid to give a decorative appearance; and that "it is called a laminant and not a plywood, because it does not have an uneven number of plys." He defined plywood as "a multiplicity of layers bonded together with grains crossing in an uneven number greater than one."

On cross-examination Mr. Macdonald described exhibit 3 as consisting of a top or face layer and a back layer of lauan veneer, and a center of hardboard with a screen back to the hardboard. The center element is generally referred to in the trade as core stock or core veneer.

Commercial Standard CS35–56, Hardwood Plywood, which was received in evidence as plaintiff's exhibit 8, was described by the witness as an agreed body of information relating to the product in question, its properties, behavior and specifications, representing an industry concensus of what is and what is not the product. Plywood is defined therein as:

A cross-banded assembly made of layers of veneer, or veneer in combination with a lumber core or plies joined with an adhesive. Two types of plywood are recognized, namely, veneer plywood and lumber-core plywood. (Except for special construction, the grain of one or more plies is approximately at right angles to that of the other plies; and an odd number of plies is used.)

The witness stated that, since lauan is considered a hardwood, the material involved herein, if within the commercial standards would be

within the hardwood and not the softwood standard. Mr. Macdonald also stated that the "Acceptors" listed in exhibit 8 are those who have accepted the Commercial Standard as a voluntary standard of the trade and that his company has accepted it.

The basic issue before the court is whether this merchandise is properly classifiable as plywood or as a manufacture of pulp under the above-cited provisions of the tariff act, as modified. There are a number of subsidiary issues.

We will say at the outset that paragraph 6 of the stipulation is *in toto* a stipulation of law, and as such it is not binding on us. *Julius Forstmann & Co.* v. *United States*, 26 CCPA 336, C.A.D. 37. Paragraph 1, so far as it states that the merchandise is "commonly known in the commerce and industry of the United States as a special construction of plywood," is likewise a stipulation of law if construed as stipulating that the common meaning of the word "plywood" includes the merchandise at bar. Common meaning is a question of law to be determined by the courts. *United States* v. *National Carloading Corp., James S. Baker Import Co.*, 48 CCPA 70, C.A.D. 767. Doubtless if the parties had intended this construction they would not have bothered to litigate further. We deal below with what, if anything, this language establishes as a matter of fact. Paragraph 2 of the stipulation involves erroneous assumptions of law which we also deal with below.

Plaintiff's first claim is that the collector's classification was contrary to the so-called ruling of the Commissioner of Customs in T.D. 54648 (7), quoted in the stipulation, *supra*, and that since no notice of a change in administrative ruling had been published, the collector's action was unlawful. *United States* v. *Fred Whitaker Company, Inc.*, 40 CCPA 19, C.A.D. 492. This claim was not set forth in the protests. At the trial, counsel for the plaintiff stated in his opening statement:

Your Honor, the Bureau of Customs issued a classification ruling covering merchandise described as hardboard, wood veneered, in the T.D. in question here. It was published in the weekly Treasury Decisions, and this was done pursuant to the provisions in the Customs Regulations of section 16.10a (a) and (b), and there were no subsequent modifications, explanations or changes to this published classification ruling, and we contend that the merchandise is fairly embraced within the terminology "hardboard, wood veneered", and that this court in effect should exercise its supervisory powers to say that when the Bureau of Customs issues a classification ruling, the Collector should adhere to this ruling. Whatever the merchandise was, in accordance with the ruling.

This statement evidences some confusion as to the nature of this

court's legal relations with the Bureau of Customs and as to the effect to be given in this court to Bureau of Customs pronouncements. However, the court understood it in light of the stipulation as foreshadowing the claim founded upon section 315(d), Tariff Act of 1930, and section 16.10a of the Customs Regulations of 1954, as clearly set forth for the first time in the plaintiff's brief. In *Bauer Alphabets, Inc.* v. *United States*, 54 Cust. Ct. 255, C.D. 2540, the second division of this court has held that noncompliance with section 315(d) must be specifically set forth in the protest, if it is to be made an issue, but in that case the Government objected when it heard the opening statement. That would have been a better practice here unless Government counsel was misled by the opening statement itself, not understanding it as the court did. Government counsel rely in their brief on the *Bauer Alphabets* case, *supra*, to establish that issues under section 315(d) are not now open. We need not decide these questions because they are mooted by the view we take as to the effect of the so-called ruling referred to as binding the Government.

That is T.D. 54648(7), quoted in paragraph 2 of the stipulation. The recital there that T.D. 54648(7) was issued under authority of section 16.10a (a) and (b) of the Customs Regulations is a recital of law. That Treasury decision itself nowhere so states and it, with the sections of the regulations referred to, and Treasury practice evidenced by the many volumes of Treasury decisions of which we take judicial notice, establish the contrary.

The procedure for advance classification rulings to importers, regulation 16.10a, had its inception in T.D. 52588, approved by Secretary Snyder, October 27, 1950, and there was no counterpart provision in the regulations before that date. However, the commissioner, then as now, had a great many other occasions to make classification rulings. Abstracts of such decisions then frequently appeared. As random examples we cite: T.D. 52494(1) Standard Newsprint Paper, June 5, 1950; T.D. 52510(1) Pickets Lumber, June 23, 1950. Such abstracts were always published in groups, captioned "Abstracts of unpublished decisions. Summary of unpublished customs decisions," together with groups of abstracts of decisions, some on matters other than classification. Now, it is clear that an abstract of a decision is not a decision. Any careful reader would observe the distinction, which the Treasury took care to reiterate with each new publication. To take an abstract for a decision is like taking a headnote for a court opinion.[1]

---

[1] *Cf.* the opinion of Rao, C. J., in *N. D. Cunningham & Co., Inc.* v. *United States*, 55 Cust. Ct. 220, C.D. 2579, holding (at p. 50 of Weekly Treasury Decisions of October 21, 1965) that a published abstract does not obtain legislative ratification of matter not disclosed in the abstract.

It will be further noted that regulation 16.10a speaks only of the classification being bound by publication of a decision, not by an abstract. The reasons for not wanting to be bound by a mere abstract are too obvious to need mentioning, being well illustrated by the case at bar.

Turning now to volume 93, of the Treasury Decisions, in which the abstract here involved T.D. 54648(7) now appears, it will be noted that in the entire year that volume covers, 1958, not a single published decision purporting to be made under 16.10a procedure appears. There are, however, hundreds of abstracts of unpublished classification decisions. One, T.D. 54648(7) we know from the stipulation had its origin in an importer's request. Others must have been of the same origin, and still others could not have been. Manifestly the practice was to publish in commingled form, without distinction, abstracts of classification decisions, however the issue was put before the commissioner. All were lumped together in groups, as in 1950, with the same caption then in use: "Abstracts of unpublished decisions. Summary of unpublished customs decisions." A decision cannot be "unpublished," as there characterized, and "published" within the meaning of regulation 16.10a(c) simultaneously. Manifestly, too, if the Treasury represented it would be bound, absent a change of practice notice, in T.D. 54648(7), it did so equally in hundreds of other abstracts that year, although many of them originated other than in an importer's request and the regulations made no provision for such decisions being made binding by any procedure. We cannot attribute to the then commissioner such a wholesale disregard of his own regulation. The correct answer is the opposite, he did not intend to bind himself and was not bound by publication of any such abstract, and he made his intentions perfectly clear. It may be added, under 16.10a(b) he was not required to publish his decision and bind himself if he did not choose to. We have not been able to locate any example of a published *decision* under regulation 16.10a and surmise there may have been none. However, the numerous decisions on American manufacturers protests under section 516(b), Tariff Act of 1930, illustrate what the Treasury Department considers the proper way to publish a decision, as against a mere abstract. *Cf.*, e.g., T.D.'s 53454 and 53645. *Cf.* also, T.D. 52816, a decision giving notice of a change of practice under section 315(d), Tariff Act of 1930.

Inspection of T.D. 54648, of which 54648(7) is a part, further discloses that neither it nor any of the other abstracts are signed. It is elementary in Federal jurisprudence that if an agency intends to bind itself by a published pronouncement that pronouncement is signed. The authority of the person signing is also published for the benefit

of careful readers. The original decisions abstracted were probably signed, but whether or not by persons authorized to bind the agency nowhere appears. That they were "decisions" at all cannot even be assumed in the circumstances, for the Treasury issues as "T.D.'s" many things that are manifestly not decisions at all, or not decisions by Treasury, i.e., notices of new statutes and trade agreements. The so-called "decisions" could, for all that appears, have been mere informative letters.

*Expressio unius est exclusio alterius.* When the Treasury intends to be bound it so states, as regulation 16.10a(c) will illustrate. If T.D. 54648(7) cannot, as we have shown it cannot, be fathered on regulation 16.10a(c) or any like provision, then the intent not to be bound is manifest. The Treasury may sometimes voluntarily limit the retroactive effect of a pronouncement, in view of an inconsistent prior pronouncement, but this is a matter of grace only, to avoid inequities, when the intent to be bound has not been announced. The only instance when the Treasury can be bound in this court without its own volition is the case of the "established and uniform practice" covered by section 315(d) of the statute. Even if the Treasury wished to bind itself, the effectiveness of its attempt in this court might at times be debatable, but of course 16.10a rests on the supposition that an "established and uniform practice" either exists already or will be called into being by the publication of the decision itself.

It may sometimes produce hard cases, not to regard the customs service as bound by the statements, written or oral, its 9,000 officers may make, when persons have acted in reliance on them. (Parenthetically, there was no showing herein whether the merchandise was ordered before or after publication of T.D. 54648(7).) However, the public interest requires that the binding of customs officers by statements of their predecessors, contemporaries, or subordinates, shall be strictly according to law and not otherwise. Furthermore, the responsibility of this court is to exercise its statutory jurisdiction over appeals and protests, not to ride around on a white horse exercising alleged "supervisory powers."

The plaintiff attempted to show that the collector's decision herein was inconsistent with T.D. 54648(7). It acknowledges, however, with commendable candor, that we may simply ignore that Treasury decision. As we regard it as simply out of the case, we do not have to decide whether plaintiff's attempt is successful, nor do we have to decide the meaning of that somewhat ambiguous Treasury pronouncement. There are also in evidence certain intracustoms communications issued via the Customs Information Exchange "for official use only." Plaintiff says they conflict with the information made public

in T.D. 54648(7), but the view we take of the latter makes moot the question whether we agree with plaintiff as to that or not.

The first question properly to be considered is whether the imported merchandise is "plywood" within the meaning of that term in paragraph 405 of the tariff act, as modified. Defendant's witness Macdonald testified that he believed this merchandise was plywood and that it would be so handled commercially. Nevertheless, the Commercial Standard for Hardwood Plywood (exhibit 8) defines plywood as made up of layers of veneer or veneer in combination with a lumber core. Nowhere in the Standard is there anything which would indicate that the term "plywood" included articles composed of layers of veneer and hardboard. It is stated that cores "may be of sawn lumber, either one piece or several pieces joined and glued, or they may be of veneer."

Other authorities define plywood as an assembled or layered product, having layers of veneer, or layers of veneer and lumber, the plies being joined by adhesive, and usually laid so that the grains of the layers are at right angles to one another. Webster's New International Dictionary; Kirk-Othmer Encyclopedia of Chemical Technology, volume 10, page 860; Plastics Engineering Handbook, page 726; Handbook of Plastics—Simonds, Weith & Bigelow, page 587. In the article on plywood in the Encyclopedia of Chemical Technology, it is stated that the newest type of overlaid plywood is one having hardboard faces and backs, but it does not state that a product having a hardboard core is plywood. It is also noted that veneer has been glued to various other materials, such as cloth and paper, to produce a variety of products. According to the Handbook of Plastics, "laminated wood" is a product closely associated with plywood but with parallel grain direction in all layers. That authority also states that there are other laminated materials having paper, cloth, asbestos fibers, glass fibers or any other strong webs or layers as cores.

In *United States* v. *Briggs Manufacturing Co.*, 14 Ct. Cust. Appls. 1, T.D. 41526, in a case arising under the Tariff Act of 1922 which contained no provision for plywood, it was held that merchandise known as 3-ply cottonwood veneer, 3-ply veneer, built-up veneer, panels, built-up wood, plywood, or veneer panels was not classifiable as veneers of wood. The Summary of Tariff Information, 1929, prepared before the enactment of the Tariff Act of 1930, states (p. 960):

Plywood is a combination of several plies or sheets of veneer glued together so that the grain on each ply is at right angles to the adjacent ply. It is made in odd multiple plies of 3, 5, 7, 9, etc. There are two distinct types: (1) Panels, referring to three or more glued-up plies of veneer, in which the face ply, core (inside ply or plies) and

back ply are each of veneer; and (2) tops, referring to the use of a core of lumber (½ to 1 inch or more in thickness) faced and backed with from one to four or more plies of veneer. * * *

The duty on birch plywood was reduced by the trade agreement with Finland, T.D. 48554, and the Digest of Trade Data prepared in connection therewith states (p. 35):

The term "plywood" refers to sheets of veneer which are glued together usually so that the grain of each ply runs at right angles to the grain of the adjacent plies. Plywood is usually made with an odd number of plies, the most commonly used forms having from three to seven plies. * * *

The Summaries of Tariff Information, 1948, volume 4, page 41, defines plywood as:

* * * a built-up product composed of several plies or sheets of veneer, or of a core of lumber and sheets of veneer, bonded with an adhesive under pressure. Usually an odd number of plies are utilized, with the grain of each ply at right angles to the grain of the adjacent plies.

Although defendant's brief states that the merchandise in *B. A. McKenzie & Co., Inc., et al.* v. *United States*, 47 CCPA 42, C.A.D. 726, was identical in every material respect to the instant merchandise, the product there was made by gluing together and curing in a press, three wood plies or veneers.

The definition in TSUS, although not binding here, is a further indication that "plywood" is composed of plies of veneer or of veneers and lumber. See headnote to schedule 2, part 3:

(b) *Plywood:* Rigid wood-veneer assemblies bonded together with adhesive substances having a central ply or core of wood veneer or lumber with one or more plies of wood veneer on each side thereof, the grain of at least one ply being at an angle (usually a right angle) with the grain of one or more of the other plies, including such assemblies the face ply (or plies) of which has been mechanically scored, striated, or similarly processed; * * *.

Products with cores of other material are distinguished in the definition in the next headnote:

(c) *Wood-veneer panels:* Rigid wood-veneer assemblies, bonded together with adhesive substances, except plywood, with a wood-veneer ply on one side of a backing, or on both sides of a core, which backing or core may be composed of lumber, veneer, hardboard, wood particle board, or other material, including such assemblies the face ply (or plies) of which has been mechanically scored, striated, or similarly processed; * * *.

We conclude that the imported merchandise is not plywood as that term is commonly understood.

Commercial designation if different from common meaning, is a matter of fact to be proved (*American Bead Co. v. United States,* 7 Ct. Cust. Appls. 18, 21, T.D. 36259; *United States v. E. Dillingham, Inc.,* 41 CCPA 221, 224, C.A.D. 555) and, therefore, may be stipulated, but the language used in paragraph 2 of the stipulation is not sufficient to establish commercial designation, nor does it appear that the parties so intended. Proof of commercial designation must be directed to the precise term used in the statute, not some similar term. *Neuman & Schwiers Co., Inc. v. United States,* 24 CCPA 127, 132, T.D. 48606. The question to be answered is "By what name are these articles designated uniformly, generally, and definitely in the trade wherever they are bought and sold?" *Passaic Worsted Co. et al. v. United States,* 17 CCPA 459, 461–462, T.D. 43916; Acc. *United States v. Pacific Overseas Co., et al.,* 42 CCPA 1, C.A.D. 559. If an article is not within the common meaning of a tariff term, in order to bring it within that term by proof of commercial designation, it must be shown that it was bought and sold or known in the trade by the term contained in the statute. *United States v. Wilfred Schade & Co.,* 16 Ct. Cust. Appls. 366, 371, T.D. 43092.

In the instant case, the stipulation does not state, in terms of the statute, that this merchandise is designated uniformly, generally, and definitely in the trade as plywood, but that it is commercially known as a special construction of plywood. The stipulation, therefore, does not establish that the imported articles are commercially designated as plywood. In fact, neither of the parties claims a commercial designation for the term "plywood." Plaintiff contends that the Government has not established commercial designation and the Government claims only that the stipulation means that the imported merchandise is a form of plywood.

What is meant by "a special construction of plywood" is not clear from the record. The Commercial Standard (exhibit 8) states:

Standard construction.—In general, plywood shall be constructed with an odd number of plies. All interior plies, except the core or center ply, shall occur in pairs, and the two plies of each pair shall be of the same species, thickness, and direction of grain, but placed on opposite sides of the core. The grain of all plies shall be at right angles to the grain of the adjacent plies and to the ends or edges of the panel. *Construction other than the above is considered special construction.* * * * [Emphasis supplied.]

This refers to the method of construction and not to the component material. Since there are products other than plywood which are made in layers, it may be that the wording in the stipulation is intended to describe the product as being made in the same way as plywood. In any event, the stipulation cannot establish that the instant merchandise is a form of plywood within the common meaning of

that term, nor is it sufficient to establish that such merchandise is plywood under the rule of commercial designation.

We turn then to the question whether this merchandise is classifiable as a manufacture of pulp under paragraph 1403, as modified, *supra.* Hardboard has been held to be a type of pulpboard made of wood pulp. *F. S. Whelan & Sons* v. *United States*, 40 Cust. Ct. 192, C.D. 1982, appeal dismissed 46 CCPA 151; *F. S. Whelan & Sons* v. *United States*, 34 Cust. Ct. 208, C.D. 1706. Since hardboard is a manufacture of pulp and the merchandise here is a manufacture of hardboard and wood veneer, it can be classified as a manufacture of pulp if it is in chief value of hardboard.

Where a statute provides for an article of a specified material without declaring to what extent it must be composed of that material, it is as a general rule confined to merchandise of which the specified material is of chief value or is the predominant one. See *United States* v. *Guy B. Barham Co., for University Shoppe*, 26 CCPA 83, T.D. 49614, and cases cited at page 84. The proper method of determining the component material of chief value is to ascertain the costs of the components to the manufacturer when they have been so far advanced that nothing remains to be done but assemble them together. *Wheeler & Miller et al.* v. *United States*, 54 Cust. Ct. 137, C.D. 2521, and cases cited at page 139. If the manufacturer purchases a component in condition ready to be assembled, the price paid is the cost or value for comparison purposes, but if the manufacturer itself fabricates a component or processes it in order to make it ready, the value is the cost of the original material, plus the expenses incurred in bringing it to its finished condition. *Turner & Co. et al. v. United States*, 12 Ct. Cust. Appls. 48, T.D. 39997. Thus a mere compilation of original material costs may fail to establish component material of chief value. *Wheeler & Miller et al.* v. *United States, supra.*

In the instant case, the witness Masuzawa testified that his company purchased the hardboard and processed it by sanding and cutting to specific size, which processing cost was a part of the cost of manufacture. The firm purchased timber and produced the veneer itself. Presumably, it purchased the resinous binding substance, although this is not stated. The witness did not state the actual monetary costs of the components to the manufacturer, nor did he give a breakdown into cost of materials and expense of labor, but gave percentage costs of the hardboard core, the veneers and the resin, as stated in our summary of the evidence, *supra.*

Defendant claims that the evidence presented is insufficient, citing *United States* v. *H. A. Caesar & Co.*, 32 CCPA 142, C.A.D. 299. The merchandise in that case was waterproof cloth made of silk, cotton, and in some instances rayon. The silk and rayon were purchased in

skeins and had to be wound and warped before they could be used in the weaving process. The witness produced a statement showing in percentage terms the value of the component materials, and stated that the value of the individual raw materials was computed on the respective purchase prices which were given. The court held that the evidence was insufficient, stating (p. 144) :

\* \* \* The only costs given are as heretofore set out and apparently those costs are for the raw materials and not for the value of the silk or rayon after they have been manipulated by winding and warping. There is nothing in the statement which accompanied the deposition to indicate anything except a ratio of costs of the various components from which it is impossible to calculate the basis thereof. Furthermore, the witness stated "The value of the individual raw materials of the finished fabric is stated in percent of the entire value of this list as always desired by the American customs authorities. The value of the individual raw materials is computed on the respective purchase prices."

The raw condition of the silk and rayon was their condition as purchased in skeins. They can scarcely be termed as "raw" after they have been wound and warped. They were not in condition to be combined with the cotton until they had been so manipulated. The cost of manipulating them is nowhere shown. Therefore, the cost of the separate parts or components at the time they were ready to be assembled has not been proved.

In the instant case, the total cost (in percentage terms) of each component has been given, but not the cost of the raw materials and the expenses of labor. This breakdown and the precise monetary figures were not disclosed because the witness was not at liberty to reveal trade secrets. While the percentages given do not establish the actual cost of the components to the manufacturer, all that is required in the instant case is sufficient evidence from which the court may find which of three components is of chief value. As to three varieties of crownboard imported, the cost of the hardboard is stated to be over half of the value. As to the other two, there is a wide enough spread for us to find that the cost of the hardboard was greater than that of either of the other components. Certain costs of making ready for assembly were applicable to the hardboard, which was cut to size and sanded. These costs were regarded as costs of manufacture and presumably are excluded from the percentage tabulation. However, whatever amounts they would be, if added to the hardboard cost, would only make its margin over the other components still greater. The manufacturer purchased logs and cut veneers from them in its own plant, but as the witness furnished the percentage cost of "veneers," it would seem he counted in their cost not only the cost of logs but also the cost of cutting. Thus, in the case of the veneer the cost given is the cost ready for assembly.

We do not think our appellate court in *Caesar, supra*, intended to prescribe an arbitrary and technical evidentiary rule. There, no doubt, the material cost evidence as presented really was such that it was impossible to tell what component material cost the most, when ready for assembly. Here, if the witness told the truth, the legally controlling facts were proved. Apparently, after refusing to answer questions put, and in a desire to be a little helpful, the witness volunteered, and the Japanese judge who took his statement received, testimony not called for by the letters rogatory. That is the percentage testimony here involved. But the Government agreed in open court that the answers as translated might be received in their entirety. It would seem any objection not going to the substance has been waived. It is difficult enough to get evidence out of foreign countries, but in proving component material of chief value, it has to be done. Any unneeded formal or technical finickiness about chief value evidence, adequate in substance, would simply be a procedure to deny justice. Apart from mechanical reliance on the authority cited, the Government says the statements are the witness' own conclusions of ultimate facts, may conceal any number of erroneous computations, were not subject to more than token cross-examination, and were not related to the significant period. Every one of these objections would apply with equal force to responsive answers to the original questions, had they been forthcoming, and yet the Government agreed that these questions might be sent, as the court papers reflect.

We hold, therefore, that the merchandise involved herein is in chief value of hardboard, a manufacture of pulp, and is dutiable under paragraph 1403, as modified, as a manufacture of pulp. The protests are sustained, and judgment will be rendered for the plaintiff.