**INTERNATIONAL LIGHT METALS, A DIVISION OF MARTIN MARIETTA TECHNOLOGIES, INC., Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

No. 99–1032.

United States Court of Appeals, Federal Circuit.

Oct. 25, 1999.

Joseph B. Tompkins, Jr., Sidley & Austin, of Washington, DC, argued for plaintiff-appellant. With him on the brief was Frank R. Volpe. Of counsel on the brief was Donald F. Beach, of Falls Church, Virginia.

Mikki Graves Walser, Attorney, Civil Division, Commercial Litigation Branch, International Trade Field Office, Department of Justice, of New York, New York, argued for defendant-appellee. With her on the brief were David W. Ogden, Acting Assistant Attorney General; and David M. Cohen, Director, Civil Division, Commercial Litigation Branch, Department of Justice, of Washington, DC. Also on the brief was Joseph I. Liebman, Attorney in Charge, International Trade Field Office.

Before PLAGER, CLEVENGER, and SCHALL, Circuit Judges.

SCHALL, Circuit Judge.

During the period between October of 1985 and November of 1987, International Light Metals ("ILM") paid duties for importing a commercially pure form of titanium called "titanium sponge." Thereafter, upon exporting articles manufactured with titanium, it filed claims of manufacturing substitution drawback pursuant to 19 U.S.C. § 1313(b).[1] After initially granting all of the claims under an accelerated program, the United States Customs Service ("Customs") denied certain claims. Specifically, Customs denied those claims with respect to which an audit revealed that the exported articles were manufactured with titanium alloy scrap rather than titanium sponge. ILM appealed the denial of its subsequent protest to the Court of International Trade. On August 24, 1998, the court granted summary judgment in favor of the United States. *International Light Metals v. United States,* 24 F.Supp.2d 281 (Ct. Int'l Trade 1998). ILM now appeals. Because we conclude that the statute does not bar ILM's drawback claims, we reverse and remand.

## BACKGROUND

### I

A manufacturer may obtain a drawback[2] under various circumstances. *See* 19 U.S.C. § 1313(a)-(*l* ); *see also Chrysler Motors Corp. v. United States,* 755 F.Supp. 388, 390 n. 3 (Ct. Int'l Trade 1990) (describing each of the circumstances). ILM sought a "manufacturing substitution" drawback under 19 U.S.C. § 1313(b). Under section 1313(b), a manufacturer can recoup duties paid for imported merchandise if it uses merchandise of the same kind and quality to produce exported articles in accordance with the statute. The statute provides as follows:

(b) Substitution for drawback purposes

If imported duty-paid merchandise and duty-free or domestic merchandise of the same kind and quality are used in the manufacture or production of articles within a period not to exceed three years from the receipt of such imported merchandise by the manufacturer or producer of such articles, there shall be allowed upon the exportation of any such articles, notwithstanding the fact that none of the imported merchandise may actually have been used in the manufacture or production of the exported articles, an amount of drawback equal to that which would have been allowable had the merchandise used therein been imported....

*Id.*[3] The statute contemplates two types of manufacturing substitution drawback, each of which may be illustrated by examples relevant to imported duty-paid titanium sponge. In the first example, a manufacturer exports ingots made with the imported sponge and identical domestic sponge: the statute allows drawback without requiring the manufacturer to identify which sponge is used. In the second example, the imported sponge and the domestic sponge are not exactly identical because they contain different trace impurities, but these differences are so inconsequential that the respective sponges may be considered to be the "same kind and quality."

1. Unless otherwise indicated, all references are to the 1988 version of the United States Code. For convenience, we refer to the statute in the present tense.

2. Customs regulations define a drawback as a "refund or remission, in whole or in part, of a customs duty, internal revenue tax, or fee lawfully assessed or collected because of a particular use made of the merchandise on which the duty, tax, or fee was assessed or collected." 19 C.F.R. § 191.2(a) (1994).

3. Section 1313(b) was subsequently amended in 1993 to, *inter alia,* apply if "imported duty-paid merchandise and any other merchandise (whether imported or domestic) of the same kind and quality are used in the manufacture ... of articles...." *See* North American Free Trade Agreement Implementation Act of 1993, Pub.L. No. 103–182, § 632(a)(2), 107 Stat. 2057 (Dec. 8, 1993).

In that case, too, the statute permits drawback without requiring the manufacturer to account for the respective origins of each sponge.

A manufacturer seeking to avail itself of the drawback privilege must comply with applicable rules and regulations. *See* 19 C.F.R. § 191.23(a) (1994). Among other things, the regulations provide that "each manufacturer ... shall apply for a specific drawback contract by submitting a drawback proposal." *See* 19 C.F.R. § 191.21(a) (1994).

## II

ILM is a Division of Martin Marietta Technologies, Inc. ("MMT"). MMT, in turn, is a wholly owned subsidiary of Martin Marietta Corporation. During the period of time at issue, ILM manufactured titanium alloy products, including ingots, billets, bars, tubes, angles, and other structural forms. It exported these products primarily for use in the aerospace industry. In its manufacturing process, ILM used commercially pure titanium sponge, titanium alloy scrap in the form of chips and turnings, and larger solid pieces of titanium alloy scrap. *See International Light Metals,* 24 F.Supp.2d at 283. When the source material was titanium sponge, ILM compressed it with alloying elements such as aluminum, iron, copper, vanadium, and carbon. *See id.* When the source material was alloy scrap in the form of chips and turnings, ILM compressed it with any additional materials needed, including titanium sponge. *See id.* These compressed materials were welded to form an electrode in a process that took about six hours to complete. When using large solid pieces of alloy scrap, however, ILM did not compress the pieces, but instead hand-welded them to form the electrode, in a process that took approximately forty hours to complete. Under any circumstance, the entire manufacturing process took from two to three months to complete.

On July 26, 1985, ILM submitted a proposal seeking a manufacturing substitution drawback contract to recoup duties paid to import "Titanium Sponge, with a minimum titanium content of 99%." The proposal provided that the "domestic merchandise of the same kind and quality ... which will be used in the production of the exported articles ... [will be] Titanium Sponge, with a minimum titanium content of 99%." In other words, ILM proposed to substitute 99% pure domestic titanium sponge for 99% pure imported titanium sponge. Customs approved the proposed contract on September 3, 1985, thereby permitting ILM to claim drawback for exported articles manufactured according to the agreed-upon substitution. *See* T.D. 85–165–(N), 19 Cust. B. & Dec. 392 (1985); *see also International Light Metals,* 24 F.Supp.2d at 284. Thereafter, between October of 1985 and November of 1987, ILM submitted drawback claims under the contract, based upon 24 entries of imported titanium sponge. *See id.*

After granting the claims under an accelerated program, *see* 19 C.F.R. § 191.72 (1994), Customs conducted an audit in 1988 pursuant to 19 C.F.R. §§ 162.1 and 191.10 (1994). The audit revealed that ILM had been obtaining drawbacks for titanium products that were manufactured using titanium sponge and also for titanium products that were manufactured using titanium alloy scrap (both its own and that of others). The auditors concluded that ILM had been paid drawbacks for substitutions not authorized by its contract. Specifically, the audit report stated that ILM was not in compliance with its drawback contract due to the substitution of domestic titanium alloy scrap for imported titanium sponge. The report further noted that at least some of the domestically produced alloy scrap did not originate from ILM, i.e., at least some came from outside domestic sources.[4] Although the auditors

4. The report stated:

ILM inputs sponge, recycled solids and chips.

observed that ILM's non-compliance "may be correctable by an amendment to the firm's drawback contract," they expressed concern that "the substituted materials may not be the same kind and quality as the designated material," as required by 19 U.S.C. § 1313(b).

It was pointed out in the audit report that ILM was relying on Treasury Decision ("T.D.") 82–36, 16 Cust. B. & Dec. 97, 97–98 (1982), which states:

> Under the drawback law (19 U.S.C. 1313(b)) drawback contracts have been approved since 1958, permitting the substitution of one domestic compound for a different imported compound when an identical element is sought for use in manufacturing an exported article.
>
> \*   \*   \*   \*   \*   \*
>
> Same kind and quality does not of course depend on the tariff schedules and never has. Often items classified under the same tariff provision and subject to the same duty are not the same kind and quality and *vice versa.*
>
> It is clear from the [legislative history] that a practical approach to the substitution provision was to be taken to relieve domestic processors and fabricators of imported dutiable merchandise, *in competing for export markets,* of the disadvantages which the duties on the imported merchandise would otherwise impose upon them. . . . To require drawback manufacturers using stoichiometric materials to segregate or account for individually the various different source materials used to obtain the essential element would be impractical and not in accord with the intent of the drawback law. Thus, substitution is allowed of primary source materials to obtain a sought element even though the domestic material would be subject to a rate of duty if imported different from that assessed on the designated merchandise, if use of the different materials does not require significant change in the manufacturing process. Designation is to be made on a pound-for-pound basis for the desired element.

T.D. 82–36, 16 Cust. B. & Dec. 97, 97–98 (1982).

In the audit report, T.D. 82–36 was interpreted as permitting substitution if only one "primary" or "sought" element is contained in the domestic material and the substitution does not significantly change the manufacturing process. In that regard, the auditors found that titanium alloy scrap contains more than just one sought element. They found that scrap also contains elements, such as aluminum, vanadium, iron, copper, and carbon, which were sought in addition to titanium, in producing the exported alloy materials. They also found that using scrap "require[s] a significant change in the manufacturing process."

ILM agreed that its existing drawback contract did not reflect its manufacturing process. Accordingly, it proposed a revised drawback contract that would reflect the process and cover the entries at issue. *See* 19 C.F.R. § 191.10(e) (1994) (contemplating the correction of errors or deficiencies in a proposal on which a drawback contract is based); 19 C.F.R. § 191.23(c) (1994) (stating that "[d]rawback entries may be filed before the drawback contract covering the claim is approved, but no drawback shall be paid until the contract is approved").[5] ILM stated that it was seeking a contract that would permit drawback on the following terms:

*IMPORTED MERCHANDISE OR DRAWBACK PRODUCTS TO BE DESIGNATED AS THE BASIS FOR*

---

In addition, ILM purchases titanium [alloy scrap] turnings and solids from outside domestic sources, and processes them through the system. They then claim drawback, on the titanium content against sponge on a pound for pound basis, even though the source of the titanium may not have been sponge.

5. This provision has since been revised and moved to 27 C.F.R. § 191.27(c). *See* 63 Fed. Reg. 10970, 10999 (Mar. 5, 1998).

*DRAWBACK ON THE EXPORTED PRODUCTS:*

Titanium sponge containing at least 99.3% pure titanium.

*DUTY–PAID DUTY–FREE OR DO-MESTIC MERCHANDISE OF THE SAME KIND AND QUALITY AS THAT DESIGNATED WHICH WILL BE USED IN THE PRODUCTION OF THE EXPORTED PRODUCTS:*

Titanium sponge containing at least 99.3% pure titanium.

Scrap made with the use of Titanium sponge containing at least 99.3% pure Titanium.

(Although it would be possible to separate the titanium alloy scrap into Titanium and its alloying elements it would be impractical to do so and, therefore, the Titanium sponge and master alloys are put into a common melt.)

The drawback terms proposed by ILM were identical to those in effect for certain other importers of titanium.

Although certain Customs officials recommended that the proposal be accepted, Customs denied ILM's request for a revised contract. It also denied ILM's request for further review. As a result, Customs liquidated 16 of ILM's 24 drawback entries (or claims), allowing drawback only in accordance with ILM's original drawback contract. After the denial of its protest of the liquidation of the 16 entries, ILM repaid the total amount of the drawback it had previously received for those entries ($477,639.73) plus interest ($76,-800.18), for a total payment of $554,439.91.

### III

ILM appealed the denial of its protest to the Court of International Trade. In its complaint, ILM stated that it was seeking to recover the $554,439.91 that it had paid to Customs after the denial of the protest. Thus, in its prayer for relief, ILM asked the court to issue an order directing the Customs Service to approve its amended drawback contract and to reliquidate the 24 entries at issue to allow all drawback requested thereunder. ILM also asked the court to direct Customs to pay to ILM the drawback payments that it had refunded, with interest. Eventually, ILM moved, and the government cross-moved, for summary judgment. *International Light Metals,* 24 F.Supp.2d at 281.

In addressing the cross-motions for summary judgment, the court first considered ILM's contention that it had complied with T.D. 82–36. *See id.* at 286–87.[6] ILM argued that T.D. 82–36 permits additional sought elements in the scrap, so long as the scrap contains the "sought element upon which drawback is based," i.e., titanium. The court rejected this argument.[7] *See id.* at 287–88. In the absence of any helpful definition of the phrase "same kind and quality" in the statute or in Customs regulations, the court resorted to T.D. 82–36 and drew from it the requirement that only a single "sought element" may be contained in the scrap. The court determined that ILM's manufacturing process failed to meet this requirement because more than a single element contained in ILM's scrap was sought for the finished product. *See id.* at 287 ("Not only is titanium sought, but ... 'other alloying elements [contained in the titanium alloy scrap] appear in the finished shapes.'" (quoting Pl.'s Br. at 45) (alteration in original)). Accordingly, the court found ILM's reliance on T.D. 82–36 to be misplaced.

The court also rejected ILM's argument that it was entitled to drawback under 19 U.S.C. § 1313(b) because titanium in the

---

6. The court parsed its analysis into four parts, rejecting each of the four arguments raised by ILM. *See id.* at 286–92. Only two parts of the court's decision are now relevant, because ILM has declined to pursue two of its rejected arguments on appeal.

7. At the same time, the court found no support for Customs' argument that the sought element "must be isolated in its pure form in the manufacturing process." *See id.* at 287 n. 3.

scrap was "of the same kind and quality" as titanium in the sponge, regardless of the overall differences between scrap and sponge. The court stated:

> While [ILM] is undoubtedly correct that the titanium contained in the two different source materials (sponge and scrap) is identical, [ILM's] argument fails to account for the fact that [its] utilization of titanium alloy scrap results in more than a single "sought element" appearing in the final product. As noted above, other elements such as aluminum, vanadium, iron, oxygen, copper, and carbon appear both in the titanium alloy scrap as well as in the finished product. . . .

*Id.* at 288.

The court turned next to ILM's argument that Customs had established, and was bound by, a long-standing administrative practice of allowing manufacturers to claim drawback under 19 U.S.C. § 1313(b) when substituting titanium scrap for titanium sponge. The court observed that ILM's evidence of such practice consisted of abstracted drawback contracts published in the Treasury Decisions. *See id.* at 289. According to the court, such abstracts are published for information only, and are not "decisions" which bind the government. *See id.* (citing, *inter alia, Ditbro Pearl Co. v. United States,* 62 C.C.P.A. 95, 515 F.2d 1157, 1158 (C.C.P.A. 1975); *Borneo Sumatra Trading Co. v. United States,* 56 Cust. Ct. 166, C.D. 2624 (1966)). The court further observed that Customs could establish a *de facto* uniform administrative practice and abandon it at any time, with only those manufacturers properly operating under such practice being entitled to notice. *See id.* at 289–90 (citing *Heraeus–Amersil, Inc. v. United States,* 617 F.Supp. 89, 94–95 (Ct. Int'l Trade 1985), *aff'd,* 795 F.2d 1575 (Fed.Cir. 1986)). Because ILM never operated under a drawback contract allowing it to substitute titanium alloy scrap for titanium sponge, the court determined that ILM could not qualify as a manufacturer enti-

tled to such notice. Consequently, the court rejected ILM's argument that Customs was bound to a *de facto* administrative practice. *See id.*

Having rejected ILM's arguments, the court granted summary judgment in favor of the government. *See id.* at 292. ILM now appeals. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

### DISCUSSION

#### I

Our standard of review in this case is non-deferential in all regards. We review a grant of summary judgment *de novo, see Conroy v. Reebok Int'l,* 14 F.3d 1570, 1575 (Fed.Cir.1994), and we conduct an independent review of the Court of International Trade's statutory interpretation. *See Hemscheidt Corp. v. United States,* 72 F.3d 868, 871 (Fed.Cir.1995); *Madison Galleries, Ltd. v. United States,* 870 F.2d 627, 629 (Fed.Cir.1989).

■ We note at the outset that there is no issue of *Chevron* deference in this case, as the government has asked us to rely on the plain language of 19 U.S.C. § 1313(b). *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *cf. Texport Oil Co. v. United States,* 185 F.3d 1291, 1294 (Fed. Cir.1999) ("Customs has not asked this court to grant its proffered interpretation . . . deference under the rule of [*Chevron* ] . . . . In these circumstances, where Customs' conspicuous silence raises the question of whether there is an official 'agenc[y] construction' of the relevant statute, we decline to *sua sponte* extend *Chevron* deference. We thus consider the parties' arguments in this case · without formal deference." (citations omitted)).

#### II

#### A

ILM contends that the decision of the Court of International Trade is contrary to

19 U.S.C. § 1313(b). It argues that: (i) Congress enacted the drawback statutes to encourage export trade and domestic manufacturing; (ii) the manufacturing substitution provision was intended to facilitate drawback; and (iii) Customs' position is inconsistent with the remedial nature of the drawback statute. ILM also asserts that Customs' position is unsupported by the plain language of the statute and the contextual meaning of the "same kind and quality" terminology of section 1313(b). ILM combines extracted passages from several dictionary definitions to support its interpretation of the statutory language as requiring "only that the imported merchandise bear close resemblance to, and possess a common attribute of, the substituted merchandise."

ILM emphasizes that the titanium in its imported sponge is identical to the titanium in the domestic scrap. ILM maintains that previous Treasury Decisions support a liberal view of "same kind and quality" when such fungible goods are intermingled. In ILM's view, moreover, T.D. 82–36 suggests a "practical approach," in which the "sought element *is* the one upon which drawback is based," making it improper to consider the other alloy components as "sought."

ILM turns next to the change in the manufacturing process. ILM acknowledges that the use of solid scrap requires a forty hour manual welding step instead of the normal six hour automatic welding step. ILM argues, however, that, in the context of a manufacturing process that takes from two to three months to com-

plete, this change cannot be considered "significant" in the dictionary sense of being "momentous" or "important."

The government responds that ILM violated regulations by failing to comply with its contract and by submitting sixteen drawback claims based upon the use of titanium alloy scrap in its manufacturing process.[8] The government further contends that ILM could not obtain a retroactive contract amendment because it failed to meet the requirements under the statute or T.D. 82–36. Addressing section 1313(b) first, the government maintains that ILM's dictionary-based interpretation of "same kind and quality" relies upon "carefully selected redacted definitions," and that a more appropriate analysis, based on a more complete survey of dictionary definitions, provides "that the substituted merchandise must be identical to, or have no difference in its constitution or character to that of the imported merchandise." According to the government, ILM's interpretation of the phrase "same kind and quality" is strained and illogical.

Although the government urges that "[t]he language 'of the same kind and quality,' . . . is clear on its face, [which] should end the inquiry," it nevertheless responds to ILM's reliance on T.D. 82–36. The government notes that, in T.D. 82–36, Customs allowed drawback on the substitution of two ores "because the 'sought element' obtained from the different compounds [was] the same." The government asserts that in the present case no element was "sought" or "obtained" from a commercial-

---

**8.** During the relevant period, Customs regulations provided that "[a]fter approval of the contract, drawback will be paid on articles manufactured or produced and exported in accordance with the law, regulations, and contract." 19 C.F.R. § 191.23(d) (1994). Customs regulations further provided:

Contents. The proposal [for a drawback contract] shall:

(1) Describe [the] manufacturing operation fully and [the] method of compliance with all requirements of the drawback law and regulations;

(2) State that the records of identification, manufacture or production, and storage . . . will be maintained; and

(3) Contain an agreement to follow the methods and keep records concerning drawback procedures.

19 C.F.R. § 191.21(b)(1) (1994). Subsequently, 19 C.F.R. §§ 191.23(d) and 191.21(b)(1) were deleted. *See* 63 Fed.Reg. 10970, 10999 (Mar. 5, 1998).

ly pure material.[9] As far as the titanium alloy scrap is concerned, the government argues that ILM did not seek an element, but sought the entire material itself, including all of the metals and nonmetals in the scrap. Thus, the government disputes ILM's argument that the phrase "sought element" should be understood to mean "the sought element upon which drawback is based." According to the government, ILM's argument "flies in the face of the actual language of T.D. 82–36," and comports with neither the letter nor the spirit of section 1313(b). Finally, the government asserts that the Court of International Trade correctly found that an increase from six to forty hours for welding in the manufacturing process was "substantial" and that, consequently, ILM's substitution did not comply with T.D. 82–36.

ILM replies that its failure to comply with the terms of its drawback contract is irrelevant because the government admits that the regulations allow "breaching" claimants to cure by retroactive amendment. *See* 19 C.F.R. § 191.10 (1994).

As far as the government's substantive arguments are concerned, ILM argues that the government's "plain language" interpretation of 19 U.S.C. § 1313(b) conflicts with T.D. 82–36. According to ILM, T.D. 82–36 allows substitution so long as the same element is sought from both the imported and domestic material. In any event, ILM asserts, T.D. 82–36 provides little guidance because it represents only a single application of manufacturing substitution and does not contain any citation to Customs regulations, rulings, or Treasury Decisions. Consequently, ILM contends, it was error for the Court of International Trade to adopt T.D. 82–36 as authoritative without engaging in statutory construction and exercising independent judgment. Specifically, ILM argues that the court accorded T.D. 82–36 unwarranted defer-

ence, without considering on its own the matter of Congressional intent.

**B**

ILM recognizes on appeal, as it did before Customs and the Court of International Trade, that it needed to amend its drawback contract in order to obtain drawback for exported articles made from scrap. ILM therefore was, for all intents and purposes, in the position of a party seeking a drawback contract *ab initio.* Consequently, the issue before us is whether, under 19 U.S.C. § 1313(b), ILM was entitled to a contract permitting drawback upon substituting titanium alloy scrap for titanium sponge.

At the outset, we note that the Court of International Trade hinged summary judgment on: (1) whether the imported titanium sponge and the titanium alloy scrap used by ILM each contained a single "sought" element; and (2) whether substitution of the scrap for sponge would significantly change the manufacturing process. Those considerations stem at least partially from T.D. 82–36. However, we are not according that ruling formal deference. *See supra* (rejecting formal deference in this case); *see also Mead Corp. v. United States,* 185 F.3d 1304, 1307 (Fed.Cir.1999) (holding that we apply the *Chevron* framework to Customs regulations, but not to "standard Customs rulings"). We further note that we find little assistance in the facts of T.D. 82–36. That ruling dealt with a substitution of copper ores, in which each ore contained impurities and a single sought element, copper.[10] In this case, the scrap contains several sought elements, and no impurities have been identified as such.

We begin our analysis, as we must, with the language of the statute itself. *See Fujitsu General Ltd. v. United States,* 88 F.3d 1034, 1040–41 (Fed.Cir.1996); *Koyo*

---

9. Titanium sponge is "commercially pure" titanium.

10. One ore contained sulfur, and the other contained oxygen, in a ratio to copper in each case of 1:2. Other impurities were not expressly noted.

*Seiko Co., Ltd. v. United States,* 36 F.3d 1565, 1570 (Fed.Cir.1994). The relevant provision is 19 U.S.C. § 1313(b), which permits manufacturing substitution drawback if imported and domestic merchandise are "of the same kind and quality."

■ We are not persuaded by ILM's dictionary-based argument that "same kind and quality" should be understood to require "only that the imported merchandise bear close resemblance to, and possess a common attribute of, the substituted merchandise." Under ILM's interpretation, it could be argued that any number of materials having no titanium whatsoever are merchandise "of the same kind and quality" as titanium. Even high purity nickel could be said to be merchandise "of the same kind and quality" as titanium under ILM's definition, because it bears a close resemblance to, and possesses a common attribute of, titanium.[11] *See Witco Chem. Corp. v. United States,* 742 F.2d 615, 619 (Fed.Cir.1984) ("[A]n absurd construction of a statutory provision should be avoided."); *Best Power Tech. Sales Corp. v. Austin,* 984 F.2d 1172, 1175–76 (Fed.Cir. 1993) (same) (quoting *Haggar Co. v. Helvering,* 308 U.S. 389, 394, 60 S.Ct. 337, 84 L.Ed. 340 (1940)).

The problem is not that the phrase "of the same kind and quality" is unclear. Rather, as we see it, the problem is that the phrase alone does not carry with it enough precision to enable us to answer the question before us. That question, of course, is whether, under 19 U.S.C. § 1313(b), titanium-containing scrap may be substituted for titanium sponge. The difficulty is that, viewed one way, it could be said that the scrap and the sponge are "of the same kind and quality" (the reason being that the titanium in the scrap—if

separated from the scrap—is virtually the same as the titanium sponge that ILM imported). Viewed another way, however, it could be said that the scrap and the sponge are not "of the same kind and quality" (the reason being that scrap is not the same as pure titanium because it contains other elements, even if in minute quantities). In short, the phrase "of the same kind and quality" does not answer the question of whether ILM is entitled to a substitution drawback if it uses titanium scrap in its manufacturing process without first separating the titanium from the scrap.

### C

■ A predecessor to the current drawback statute did not permit manufacturing substitution. Instead it permitted, for "articles wholly manufactured of materials imported, on which duties have been paid when exported, a drawback equal in amount to the duty paid on such materials." Act, August 5, 1861, § 4, 12 Stat. 292, Rev. St. § 3019. The Supreme Court, in *Tide–Water Oil Co. v. United States,* 171 U.S. 210, 215, 18 S.Ct. 837, 43 L.Ed. 139 (1898), summarized the objectives of this earlier statute:

> The objects of [the drawback provision] were evidently not only to build up an export trade, but to encourage manufactures in this country, where such manufactures are intended for exportation, by granting a rebate of duties upon the raw or prepared materials imported, and thus enabling the manufacturer to compete in foreign markets with the same articles manufactured in other countries.

171 U.S. at 216, 18 S.Ct. 837.[12] It was not until the enactment of section 313(b) of the

---

**11.** Nickel and titanium bear a close resemblance to each other because they are both lustrous white metals. The two metals may be said to share a common attribute of "strength" because high purity forms of each exhibit commensurate tensile yield strengths (e.g., 25,000 lb/in$^2$ with appropriate anneal-

ing). *See* George S. Brady et al., *Materials Handbook* 582–83, 902–04 (14th ed.1997).

**12.** These objectives survive in the present embodiment of the drawback statute. *See Texport,* 185 F.3d at 1296–97 ("The purpose of drawback is to place those who export from the United States on an equal footing with

Tariff Act of 1930 that any manufacturers were entitled to claim drawback on exported articles made with domestic merchandise substituted for imported duty-paid merchandise. *See* Tariff Act of 1930, c. 497, Title III, § 313, 46 Stat. 693.

A Senate report in the legislative history of the Tariff Act of 1930 provides some insight into the purpose and scope of 19 U.S.C. § 1313(b). At that time, a House bill proposed that substitution drawback be authorized only in the case of sugar and nonferrous metals. The Senate report stated:

> The effect of the provision [proposed by the House] is to permit the substitution of duty-free or domestic sugar or nonferrous metal for imported merchandise of the same kind and quality, so that the exporter will be relieved from the requirement of the present law that proof be furnished that the imported merchandise has actually been used in the particular article that is exported.... Your committee believes that this provision is fair and just to manufacturers using these commodities and will result in no jeopardy to the revenues. It was urged before your committee that the privilege of substitution for drawback purposes should be made general. Your committee was not convinced of the soundness or the advisability of this proposition. The privilege is peculiarly adapted to the case of sugar and nonferrous metals, which are more or less stable commodities, and, moreover, the application of the drawback provisions of the existing law to these commodities has resulted in considerable hardship owing to the difficulty in establishing proof that imported merchandise is actually present in the exported article. For instance, an exporter of canned goods using both imported and domestic sugar must, in order to properly make proof, warehouse

his imported sugar separately and use it exclusively, or have separate sirup vats for sirup made from imported sugar, and sirup made from domestic or duty-free sugar. Frequently, honest drawback claims on sugar and metal have been given up on account of the impossibility of making such proof. It may be that the administration of the provision in the case of sugar and nonferrous metal will demonstrate the practicability of making the privilege general at a future date.

S.Rep. No. 71–37, at 62 (1929). The sugar and nonferrous metals provision was subsequently enacted, as follows:

> If imported duty-paid sugar or non-ferrous metal, or ore containing non-ferrous metal, and duty free or domestic merchandise of the same kind and quality are used in the manufacture or production of articles within a period not to exceed one year from the receipt of such imported merchandise by the manufacturer or producer of such articles, there shall be allowed upon the exportation ... of any such articles, notwithstanding the fact that none of the imported merchandise may actually have been used in the manufacture or production of the exported articles, an amount of drawback equal to that which would have been allowable had the sugar or nonferrous metal, or ore containing nonferrous metal, used therein been imported....

*See* Tariff Act of 1930, ch. 497, tit. III, § 313, 46 Stat. 693.

As evidenced by amendments throughout the years leading to the current law, the original provision did indeed demonstrate the practicability of making general the privilege under 19 U.S.C. § 1313(b). *See* Act, August 8, 1951, ch. 297, 65 Stat. 175;[13] Act, August 6, 1956, ch. 1021, § 2,

---

overseas competitors, by largely refunding the sums paid to import certain materials, thus eliminating or diminishing the cost disadvantage resulting from the presence of import duties, taxes, or fees.").

**13.** The Act of August 8, 1951 extended section 1313(b) to flaxseed and linseed, and flaxseed and linseed oil. *See id.*

70 Stat. 1076;[14] Act, August 18, 1958, Pub.L. No. 85–673, § 1, 72 Stat. 624. The last of these amendments was made in the Act of August 18, 1958, *see id.,* which extended section 1313(b) to imported duty-paid "merchandise" in general. Nothing in these several amendments suggests to us that, in enacting them, Congress intended to signal a departure from the original purpose of 19 U.S.C. § 1313(b). *See, e.g.,* S.Rep. No. 85–2165 (1958), *reprinted in* 1958 U.S.C.C.A.N. 3576, 3577.

Specifically, the unchanged purpose of section 1313(b), as stated in the above-quoted passage from the legislative history of the Tariff Act of 1930, was to facilitate honest drawback claims for such stable commodities as sugar, which present fungibility difficulties, i.e., difficulties in accounting for whether the imported merchandise has actually been used in the particular article. We therefore inform our understanding of the phrase "same kind and quality" with the concern expressed in the legislative history about alleviating difficulties of proof in honest drawback cases.

That said, we cannot say that, on the facts of this case, ILM's drawback claim does not fit within the statutory purpose. Three points are particularly compelling to us. First, it is undisputed that the titanium in the scrap was identical to the titanium in the sponge that ILM imported. Accordingly, the titanium in the domestic scrap was "of the same kind and quality" as the titanium in the imported sponge. Second, there is no dispute as to the amount of titanium that was in the scrap. As a result, the amount of a drawback to which ILM would be entitled based upon the titanium in that scrap and the titanium in the imported sponge could be precisely determined.

Third, the government's position results in a "no scrap" rule, one for which we find no support in the statute. To explain, if ILM used imported or substituted domestic titanium sponge to make an alloy ingot from which exported articles were made, under the government's theory ILM would get a drawback duty for the amount of titanium sponge found in the exported articles. But if the manufacturing process resulted in waste (scrap), or ILM used scrap from other sources, and ILM recycled the scrap into alloy ingots from which more articles for export were made, then no drawback would be paid for the amount of titanium sponge in the articles made from the "scrap" ingots, even if, as is the case here, the amount of titanium sponge in the scrap could be accurately determined. If, however, ILM first expended the time and money to extract the titanium sponge from the scrap, then mixed the extract with other metals to form ingots from which exported articles were made, the government would allow drawback.

■ The aim of the drawback duty statute is to encourage domestic manufacture of articles for export and to allow those articles to compete fairly in the world marketplace. The "no scrap" rule advocated by the government would frustrate that aim.

■ Finally, we are not persuaded that a thirty-six hour increase in welding time, in the context of a manufacturing process that normally takes two to three months to complete, is significant enough to thwart the statutory objective of facilitating honest claims of drawback. Significantly, Customs would have allowed drawback if ILM had separated the titanium from the scrap and then used it in the manufacturing process. We see no reason why ILM should be required to undertake such an additional step when it is undisputed that the same materials (including the titanium) would have to be combined again to obtain the final export product.

---

**14.** The Act of August 6, 1956 extended section 1313(b) to coated or uncoated printed papers.    *See id.*

We thus conclude that ILM's proposal for a revised drawback contract was consistent with the requirements of 19 U.S.C. § 1313(b) because the titanium alloy scrap that ILM used in its manufacturing process contained titanium that was, in the words of the statute, "of the same kind and quality" as the titanium it imported. In the Court of International Trade, the government forthrightly acknowledged that "[h]ad ILM's operations complied with the statute and regulations[,] ... its modified contract would have been approved. Customs has long taken the position that, provided that the law and regulations are complied with, a drawback claimant may amend its contract and receive drawback for claims filed before the amendment when the unamended contract was not followed." *See* Defendant's Supplemental Brief in Response To The Court's Questions As Posed on August 6, 1998, And In Support Of Defendant's Cross–Motion For Summary Judgment at 13–14. We have held that ILM's operations did in fact comply with section 1313(b). Under these circumstances, ILM was entitled to a revised contract that would have permitted drawback based upon the 16 entries (claims) that were not covered by its original contract.[15]

### ·CONCLUSION

Given the undisputed facts of the case, summary judgment in favor of the government was error because ILM's drawback claims were neither contrary to the language of the statute nor the intent of Congress, to the extent that we can discern that intent from the legislative history. Because Customs imposed upon ILM requirements not found in the statute, the decision of the Court of International Trade is reversed. The judgment in favor of the United States is reversed, and the case is remanded for further proceedings consistent with this opinion.

### COSTS

Each party shall bear its own costs.

*REVERSED* and *REMANDED*

---

**15.** ILM asserts that the denial of its protest constituted a discriminatory and unlawful deviation from a long-standing administrative practice. It points to Treasury Decisions and Customs contracts wherein manufacturers were permitted to substitute scrap containing a sought element for the sought element itself. It further notes that, as indicated above, contracts were granted to other manufacturers whose manufacturing processes closely mirrored ILM's, and asserts that Customs granted Axel Johnson Metals an amendment of a contract similar to ILM's. We need not reach these arguments, however, because we have concluded that summary judgment was improperly granted in favor of the government based upon an erroneous view of the requirements of the statute.