Slip Op. 00-122

# UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE:  RICHARD K. EATON, JUDGE**

_____
                         :

**E. I. DU PONT DE NEMOURS AND**    :
**COMPANY**,                           

                         :

        Plaintiff,           :

                         :

           v.             :        **Court No. 96-12-02657**

                         :

**UNITED STATES**,             :

                         :

        Defendant.      :

_____:

[Defendant's motion for summary judgment is denied; Plaintiff's cross-motion for summary judgment is granted.]

       Domestic manufacturer and exporter of titanium dioxide pigments brought action contesting denial by United States Customs Service of its claim for manufacturing substitution drawback pursuant to 19 U.S.C. § 1313(b) (1994).  Defendant moved for summary judgment, seeking dismissal of action. Plaintiff manufacturer cross-moved for summary judgment, requesting approval of proposed drawback contract, reliquidation of drawback entry, and payment of drawback claim.  The Court of International Trade, Eaton, J., held that Plaintiff had satisfied the requirements of 19 U.S.C. § 1313(b) and was therefore entitled to manufacturing substitution drawback.

                                 Decided: September 20, 2000

       *Crowell & Moring LLP* (*Barry E. Cohen* and *John I. Blanck, Jr.*), for Plaintiff.

       *David W. Ogden*, Assistant Attorney General; *Joseph I. Liebman*, Attorney in Charge, International Trade Field Office; *Amy M. Rubin*, Civil Division, Department of Justice, Commercial Litigation Branch, for Defendant.

## OPINION

**EATON, JUDGE**:  Before the Court are cross-motions for summary judgment filed pursuant to USCIT R. 56 by Defendant United States of America ("Government") on behalf of the United States Customs Service ("Customs") and Plaintiff E. I. du Pont de Nemours and Company ("DuPont") with respect to DuPont's claim for manufacturing substitution drawback under 19 U.S.C. § 1313(b) (1994). The Court grants summary judgment in favor of DuPont.

## JURISDICTION

The Court has exclusive jurisdiction over any civil action commenced to contest Customs' denial of a protest under 19 U.S.C. § 1515 (1994).  See 28 U.S.C. § 1581(a) (1994); see also Mitsubishi Electronics America, Inc. v. United States, 44 F.3d 973, 976 (Fed. Cir. 1992).

## BACKGROUND

DuPont is a domestic corporation engaged in various industrial enterprises worldwide.  This action concerns DuPont's pigments business and, specifically, its importation of titaniferous raw materials for the manufacture and subsequent export of "Ti-Pure" brand titanium dioxide pigments.  At issue is DuPont's entitlement under 19 U.S.C. § 1313(b) to a drawback upon exportation from December 1988 through March 1989 of 60 shipments of "Ti-Pure R-960" titanium dioxide pigment manufactured in the United States.

On December 3, 1991, DuPont submitted a proposed drawback contract[1] under 19 U.S.C. §

1313(b), seeking manufacturing substitution duty drawback[2] for the titanium appearing in any

prospective exports of Ti-Pure titanium dioxide pigments manufactured with the use of four titaniferous

ores ("feedstocks").  (Compl. at ¶ 5.)  On December 6, 1991, DuPont filed a Manufacturing

Drawback Certificate, No. G82-0000542, claiming a $37,540.00 drawback for titanium appearing in

exported Ti-Pure R-960.  DuPont designated as the basis of this claim the titanium contained in the

substituted feedstock synthetic rutile, entry No. 86-247171-2, which was imported on April 3, 1986.

---

[1]        A party seeking drawback for exported articles under 19 U.S.C. § 1313(b) is required to submit a proposed drawback contract to Customs.  See 19 C.F.R. § 191.21 (1996).  A party's entitlement to receive a drawback is dependent upon Customs' approval of the proposed contract. See id.

[2]        "Manufacturing substitution duty drawback" generally, is the refund of duties paid on goods imported into the United States when those goods, or domestic goods of the same kind and quality, are used in the manufacture or production of articles which are subsequently exported.  See NEVILLE, PETERSON & WILLIAMS, CUSTOMS LAW & ADMINISTRATION § 17.1 (3d ed. 1999).  The authority for allowing this drawback is found in 19 U.S.C. § 1313(b), which allows a manufacturer to recoup duties paid for imported merchandise if it uses merchandise of the "same kind and quality" to produce exported articles in accordance with the statute.  See 19 U.S.C. § 1313(b).  The statute provides:

> If imported duty-paid merchandise and any other merchandise (whether imported or domestic) of the same kind and quality are used in the manufacture or production of articles within a period not to exceed three years from the receipt of such imported merchandise by the manufacturer or producer of such articles, there shall be allowed upon the exportation . . . of any such articles, notwithstanding the fact that none of the imported merchandise may actually have been used in the manufacture or production of the exported or destroyed articles, an amount of drawback equal to that which would have been allowable had the merchandise used therein been imported . . . .

Id.

Following correspondence between the parties, Customs denied DuPont's proposed drawback contract, revised on or about March 4, 1994, stating that DuPont failed to comply with the "same kind and quality" requirement of Treasury Decision ("T.D.") 82-36[3] because titanium was never isolated as an element during DuPont's manufacturing process. (Compl. at Ex. 5.) Customs emphasized that the titanium actually used in the manufacturing process was always combined with another element, i.e., oxygen, and that DuPont was actually seeking titanium only as part of the compound titanium dioxide, and not as a discrete element. (Compl. at Ex. 5.)

On April 5, 1996, Customs liquidated the drawback entry at issue, refusing to allow the claim for drawback. DuPont protested the liquidation, which was denied by Customs on July 19, 1996. DuPont commenced this action on November 25, 1996.

---

[3]     T.D. 82-36 endeavored to amplify the statute:

> Under the drawback law (19 U.S.C. 1313(b)) drawback contracts have been approved since 1958, permitting the substitution of one domestic compound for a different imported compound when an *identical element* is sought for use in manufacturing an exported article. . . . [S]ubstitution is allowed of primary source materials to obtain a sought element even though the domestic material would be subject to a rate of duty if imported different from that assessed on the designated merchandise, if use of the different materials does not require significant change in the manufacturing process.

T.D. 82-36, 16 Cust. B. & Dec. 97, 97-98 (1982) (emphasis added); see also 19 C.F.R. § 191.2(x)(1) (1999); 63 Fed. Reg. 10,970, 11,008 (1998).

In its Memorandum in Support of its Motion for Summary Judgment, the Government asserts that DuPont's drawback proposal fails to satisfy the statutory requirements for manufacturing substitution drawback. (Def.'s Mem. Supp. Summ. J. at 6, 11.) The Government further claims that DuPont's use of various feedstocks, and its failure to isolate the titanium as an element during its manufacturing process, takes its drawback proposal outside the scope of the requirements of T.D. 82-36, which purports to set forth the parameters within which different raw materials may be used as sources of a metallic element to satisfy the "same kind and quality" requirement of 19 U.S.C. § 1313(b). (Def.'s Mem. Supp. Summ. J. at 7, 11.)

In its Opposition to Defendant's Motion for Summary Judgment and Memorandum in Support of Cross Motion for Summary Judgment, DuPont contends that it is entitled to manufacturing substitution duty drawback because its manufacturing process satisfies the criteria found in the applicable statutory and regulatory requirements. (Pl.'s Mem. Supp. Cross-Mot. Summ. J. at 3.) Specifically, DuPont contends its operations comply with the requirements of 19 U.S.C. § 1313(b) and T.D. 82-36. (Pl.'s Mem. Supp. Cross-Mot. Summ. J. at 3.) Oral arguments on the parties' cross-motions for summary judgment were heard by the late Judge Dominick L. DiCarlo on January 7, 1999, and again before this Court on May 9, 2000.

**FACTS**

In the manufacture of its titanium pigments, DuPont uses the following imported and domestic feedstocks: (1) rutile; (2) synthetic rutile; (3) titanium slag; and (4) ilmenite. (Pl.'s Mem. Supp. Cross-Mot. Summ. J. at 5; Def.'s Resp. Pl.'s Material Facts Not In Disp. ¶ 1.) DuPont's production process involves combining feedstocks and various cleansing agents in a "reaction vessel" where the materials are heated, refined, and then combined with oxygen to

form titanium dioxide. (Pl.'s Mem. Supp. Cross-Mot. Summ. J. at v; Def.'s Resp. Pl.'s Material Facts Not In Disp. ¶ 2.)

The first step in DuPont's process involves heating a blend of the feedstocks in the reaction vessel with petroleum coke and chlorine. (Pl.'s Mem. Supp. Cross-Mot. Summ. J. at vi; Def.'s Resp. Pl.'s Material Facts Not In Disp. ¶ 4.) During the second phase of the process, additional chemicals are introduced into the reaction vessel to remove all of the excess waste materials, thus yielding pure titanium tetrachloride. (Pl.'s Mem. Supp. Cross-Mot. Summ. J. at vi; Def.'s Resp. Pl.'s Material Facts Not In Disp. ¶ 5.) In the third stage of the process, the pure titanium tetrachloride is combined with oxygen at a high temperature, causing a reaction in which the atomic bonds between the titanium and the chlorine split. The titanium then bonds with oxygen atoms to form pure titanium dioxide. (Pl.'s Mem. Supp. Cross-Mot. Summ. J. at vi; Def.'s Resp. Pl.'s Material Facts Not In Disp. ¶ 6.) At no time is titanium isolated as a discrete element, but rather is generated in the form of titanium dioxide.

This titanium dioxide is then used in the manufacture of pigments.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." USCIT R. 56(d); see also Marathon Oil Co. v. United States, 24 CIT __, __, 93 F. Supp. 2d 1277, 1279 (2000). The Court should deny a motion for summary judgment if there are material facts in dispute that "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). As there are no remaining questions of material fact in dispute, summary judgment is proper in this case. Accordingly, the statutory presumption of factual correctness for Customs decisions under 28 U.S.C. § 2639(a)(1) is not relevant to this case. See Goodman Manufacturing, L.P. v. United States, 69 F.3d 505, 508 (Fed. Cir. 1995); Marathon Oil, 93 F. Supp. 2d at 1279.

## DISCUSSION

The question of law before the Court concerns the proper interpretation of the phrase "same kind and quality" as contained in 19 U.S.C. § 1313(b). Because much of the briefing in this case was accomplished before the United States Court of Appeals for the Federal Circuit issued its decision in International Light Metals v. United States, 194 F.3d 1355 (Fed. Cir. 1999) ("ILM"), great attention

was given by both parties to T.D. 82-36. In <u>ILM</u>, the Federal Circuit found that Customs did not seek

"<u>Chevron</u>"[4] deference for T.D. 82-36 and declined to grant deference <u>sua sponte</u>. See <u>ILM</u>, 194 F.3d

at 1361. In the instant case, it is unclear whether Customs is seeking <u>Chevron</u>-style deference.[5]

Because Customs' position is unclear, this Court, like the Federal Circuit, declines to grant <u>Chevron</u>

deference to T.D. 82-36 <u>sua sponte</u>.[6] See <u>ILM</u>, 194 F.3d at 1361.

---

[4]        <u>Chevron U.S.A., Inc. v. National Resources Defense Council, Inc.</u>, 467 U.S. 837 (1984), requires courts to give deference to an agency's reasonable interpretation of a statutory ambiguity. See <u>Chevron</u>, 467 U.S. at 843-45.

[5]        The text of the Government's Memorandum in Support of Summary Judgment merely asserts that Customs has the authority to issue rulings and that these rulings "must be consistent with the statutes they interpret; if a court finds that the two cannot be applied harmoniously, the statute must prevail." (Def.'s Mem. Supp. Summ. J. at 11.)

At the May 9, 2000 oral argument, counsel for the Government stated that, "[a]lthough . . . [Customs'] denial was worded in terms of the proposed contract's failure to meet the conditions of T.D. 82-36 . . . any suggestion that the Court can look solely to the conditions contained in the T.D. and ignore the statute is simply wrong." (Transcript of May 9, 2000 oral argument ("Tr.") 3:15-22).

[6]        Had the Government requested that <u>Chevron</u> deference be extended to T.D. 82-36, this Court would have declined to do so in any event. There is no evidence that, prior to issuance, T.D. 82-36 was subjected to the type of formal rulemaking procedures that are a condition for <u>Chevron</u>-style deference. See <u>Christensen v. Harris County</u>, 120 S.Ct. 1655, 1662 (2000); <u>Mead Corp. v. United States</u>, 185 F.3d 1304, 1307 (Fed. Cir. 1999), <u>cert. granted</u>, 120 S.Ct. 2193 (2000) (No. 99-1434); <u>Genesco, Inc. v. United States</u>, 24 CIT __, __, 102 F. Supp. 2d 478, 484 (2000).

In addition, it appears to be the position of the Customs Service that T.D. 82-36 is not entitled to deference. In 1978, when it changed its system of designation of materials published in the Customs Bulletin, the Customs Service stated that henceforth the designation "Treasury Decision" would be used for documents that "contain information of an official nature which *does not constitute legal precedent* but for which a publication citation is required." T.D. 78-414, 12 Cust. B. & Dec. 920 (1978) (emphasis added).

Thus, this Court finds itself in the same posture as the Federal Circuit in <u>ILM</u>, and is therefore bound by that court's construction of 19 U.S.C. § 1313(b). In <u>ILM</u>, the Federal Circuit found that titanium sponge was eligible for drawback when titanium scrap was used in its place in a manufacturing process which required titanium metal. <u>See</u> <u>ILM</u>, 194 F.3d at 1367. The Federal Circuit held that the scrap satisfied the statutory requirement that the "merchandise" (titanium scrap) be of the "same kind and quality" as the imported "merchandise" (titanium sponge) for which it was substituted. <u>See</u> <u>id.</u> The Federal Circuit reached its conclusion even though the scrap, unlike the sponge, contained other metals which were salvaged as part of the manufacturing process, and even though the welding step of the manufacturing process took longer when scrap was used. <u>See</u> <u>id.</u> at 1366. In its decision, the Federal Circuit found three factors to be compelling:

> First . . . it is undisputed that the titanium in the scrap was identical to the titanium in the sponge that ILM imported. Accordingly, the titanium in the domestic scrap was 'of the same kind and quality' as the titanium in the imported sponge. Second, there is no dispute as to the amount of titanium that was in the scrap. As a result, the amount of a drawback to which ILM would be entitled based upon the titanium in that scrap and the titanium in the imported sponge could be precisely determined.

> Third, the government's position results in a "no scrap" rule, one for which
> we find no support in the statute.

Id.

By applying the three factors that the Federal Circuit found compelling in ILM, this Court concludes that DuPont is entitled to drawback. First, as in ILM, it is undisputed that the titanium contained in each of the source feedstocks is identical. (Pl.'s Mem. Supp. Cross-Mot. Summ. J. at v; Def.'s Resp. Pl.'s Material Facts Not In Disp. ¶ 2.) Therefore, the titanium contained in the imported and domestic feedstocks is of the "same kind and quality" under 19 U.S.C. § 1313(b). See ILM, 194 F.3d at 1366. As the court in ILM explained, the underlying statutory purpose for section 1313(b) is to "facilitate honest drawback claims for such stable commodities as sugar, which present fungible difficulties, i.e., difficulties in accounting for whether the imported merchandise has actually been used in the particular article." Id. As a result of this underlying purpose, the court reasoned that the phrase "same kind and quality" should be applied only to the sought element contained in a source material, and not to the source material as a whole or the impurities contained therein. See id. Thus, although different ores may be made up of a number of elements, the "same kind and quality" standard applies only to the element used in manufacturing the exported article.

Second, as in ILM, the amount of titanium contained in the imported and domestic feedstocks can be precisely determined. There is no dispute on this question. During the May 9, 2000 oral

argument, counsel for the Government stated, "[W]e don't necessarily disagree that the titanium content can be determined." (Tr. 29:20-21.) At that same argument, counsel for DuPont stated, "The amount of titanium metal can be calculated easily." (Tr. 28:5-6.) Indeed, the amount of titanium, in pounds, for both the imported and exported merchandise is stated on the Manufacturing Drawback Certificate. Customs has never disputed the accuracy of this calculation. As there is no dispute that the amount of titanium can accurately be determined, the second ILM factor has been satisfied. The Government, as something of an afterthought, asserts that a ruling in favor of DuPont would place an undue burden on Customs because of the difficulty involved in calculating the proper amount of DuPont's drawback. (Def.'s Resp. Pl.'s Supplemental Submission Supp. Summ. J. at 7.) According to the Government, the rate of duty on the imported merchandise for which drawback is claimed (synthetic rutile) was an ad valorem rate on the value of the ore, rather than on the value of the titanium content. (Def.'s Resp. Pl.'s Supplemental Submission Supp. Summ. J. at 7.) The Government argues that any drawback would entail the difficult task of apportioning the duty paid between the synthetic rutile's titanium content and the other elements contained therein. (Def.'s Resp. Pl.'s Supplemental Submission Supp. Summ. J. at 7.) However, since the uncontroverted Manufacturing Drawback Certificate contains the necessary percentages for making the calculation, this burden would not seem to be a sufficient reason for denying DuPont its relief. Furthermore, the Government's argument that the four source feedstocks were not at the time of this action classified under the same tariff provision and are, therefore, not of the "same kind and quality," is not compelling. (Def.'s Resp. Pl.'s Supplemental Submission Supp. Summ. J. at 6-7.)

This Court need not grant formal deference to T.D. 82-36 to note its statement of the self-evident, i.e.,

"[s]ame kind and quality does not . . . depend on the tariff schedules and never has.  Often items

classified under the same tariff provisions and subject to the same duty are not the same kind and

quality and vice versa."  T.D. 82-36, 16 Cust. B. & Dec. 97, 98 (1982).

Third, this Court, like the Federal Circuit, finds no support for the Government's argument that,

during the manufacturing process, titanium must be extracted as a discrete

element from the various feedstocks in order to comply with the requirements of T.D. 82-36[7] and 19

U.S.C. § 1313(b).  (Def.'s Mem. Supp. Mot. Summ. J. at 13.)  The situation in the instant case is

remarkably similar to that in ILM, where the Federal Circuit did not require an extra step in the

manufacturing process in order to comply with the government's "no scrap" rule.[8]  See ILM, 194 F.3d

at 1366.  "We see no reason why ILM should be required to undertake such an additional step when it

is undisputed that the same materials (including the titanium) would have to be combined again to obtain

the final export product."  Id.  As it is undisputed that DuPont extracted the sought element titanium in

_____

        [7]        While the Court has declined to grant Chevron deference to T.D. 82-36, the Government's argument regarding the requirement under T.D. 82-36 that the sought element be isolated during the manufacturing process is relevant to this discussion because it was specifically addressed by the court in ILM.

        [8]        The Federal Circuit in ILM found "no support in the statute" for Customs' "no scrap" rule, which it described as follows: "[I]f . . . ILM had first expended the time and money to extract the titanium sponge from the scrap, then mixed the extract with other metals to form ingots from which exported articles were made, the government would allow drawback," but not if these extra, and unnecessary, steps were not taken.  ILM, 194 F.3d at 1366.

the useful form of titanium dioxide, this Court cannot hold that DuPont's drawback claim is inconsistent with the requirements of 19 U.S.C. § 1313(b). See id.

Finally, we turn to the question of whether or not the substitution of another feedstock for synthetic rutile would sufficiently alter DuPont's manufacturing process so as to defeat the notion that the feedstocks are of the same kind and quality. Both parties agree that, no matter which feedstocks are combined for use in DuPont's manufacturing process, the steps involved, the order of the steps, and the chemicals used remain constant. (Pl.'s Mem. Supp. Cross-Mot. Summ. J. at 5-7; Def.'s Resp. Pl.'s Material Facts Not In Disp. ¶¶ 3, 9.) There is also agreement that the substitution of other feedstocks for synthetic rutile would alter the time used to complete the steps, the amount of chemicals used in the process, and the amount of waste produced by the procedure. However, these changes are not changes in process, but merely routine adjustments in procedure that are made to take into account the relative purity of the ore.[9] Indeed, any questions regarding changes in the manufacturing process are rendered largely academic since, in actual practice, the various ores are almost always combined to produce a mixture with a constant titanium dioxide content. (Def.'s Statement of Facts ¶ 22.) Once

---

[9]     No single ore category contains an exact amount of titanium dioxide. Rutile contains "more than 92% titanium dioxide"; synthetic rutile contains anywhere from 90-95% titanium dioxide; slag contains anywhere from 75-90% titanium dioxide; and ilmenite contains anywhere from 35-70% titanium dioxide. (Def.'s Statement of Facts ¶¶ 12-15.) Thus, the manufacturing variations in time, chemicals, and waste that could occur among the different feedstocks could also occur with feedstocks in the same ore category.

again, this Court finds the decision in <u>ILM</u> instructive.  The Court in <u>ILM</u> found that changes in a

manufacturing process are acceptable for the purposes of allowing substitution drawback.  There, the

Federal Circuit found that "a thirty-six hour increase in welding time, in the context of a manufacturing

process that normally takes two to three months to complete . . . [was not] significant enough to thwart

the statutory objective of facilitating honest claims of drawback."  <u>Id.</u>  In the case at bar, the

adjustments to the procedure are not substantial enough to "thwart the statutory objective of facilitating

. . . drawback."  <u>Id.</u>

**CONCLUSION**

For the foregoing reasons, the Government's motion for summary judgment is denied, and

DuPont's cross-motion for summary judgment is granted.  Accordingly, Customs is instructed to

approve the proposed drawback contract as revised by DuPont on or about March 4, 1994,

reliquidate the drawback entry, and pay DuPont's drawback claim in accordance with this decision.

Judgment will be entered accordingly.

_____
Richard K. Eaton, Judge

Dated:  September 20, 2000
        New York, New York

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  RICHARD K. EATON, JUDGE

_____

E. I. DU PONT DE NEMOURS AND
COMPANY,

        Plaintiff,

              v.

UNITED STATES,

**Court No. 96-12-02657**