330 F.3d 1358
 DEFENDERS OF WILDLIFE, EARTH ISLAND INSTITUTE, the Humane Society of the United States, Environmental Solutions International, Animal Welfare Institute, International Wildlife Coalition, American Humane Association, Earthtrust, Greenpeace Foundation, Animal Fund, American Society for the Prevention of Cruelty to Animals, Sierra Club, Samuel Labudde, and Craig Van Note, Plaintiffs-Appellants, and
Fund for Animals and David Brower, Plaintiffs,
v.
William T. HOGARTH, Assistant Administrator for Fisheries, National Oceanic and Atmospheric Administration, Donald L. Evans, Secretary of Commerce, Under Secretary of Commerce, Administrator of the National Oceanic and Atmospheric Administration, Assistant Secretary, National Oceanic and Atmospheric Administration, Secretary of State, Secretary of the Treasury, and Commissioner of the United States Customs Service, Defendants-Appellees.
 No. 02-1224.
 United States Court of Appeals, Federal Circuit.
 June 4, 2003.
 
 William J. Snape, III, Defenders of Wildlife of Washington, DC, argued for plaintiffs-appellants. Of counsel was Kumar Vaswani.
 Lucius B. Lau, Assistant Director, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendants-appellees. With him on the brief were Thomas L. Sansonetti, Assistant Attorney General; and David M. Cohen, Director. Of counsel on the brief were Anthony P. Hoang, Wayne D. Hettenbach, and M. Alice Thurston, Attorneys, Environment & Natural Resources Division, Department of Justice, of Washington, DC.
 Brian O'Neill, Faegre & Benson LLP of Minneapolis, Minnesota, for amici curiae Dr. Albert Myrick & OrcaLab. With him on the brief was Colette B. Routel.
 Before NEWMAN, LOURIE and SCHALL, Circuit Judges.
 Opinion for the court filed by Circuit Judge SCHALL. Opinion concurring in part and dissenting in part filed by Circuit Judge PAULINE NEWMAN.
 SCHALL, Circuit Judge.
 
 
 1
 Defenders of Wildlife, various other nongovernmental organizations, and several individuals filed suit in the United States Court of International Trade challenging three administrative determinations made by the Assistant Administrator for Fisheries of the National Marine Fisheries Service ("NMFS"). NMFS is part of the National Oceanic and Atmospheric Administration ("NOAA"), which is a component of the United States Department of Commerce ("Commerce"). Plaintiffs[1] asserted (1) that NMFS's Interim-Final Rule on the taking of dolphins from depleted stocks in the Eastern Tropical Pacific Ocean ("ETP") using the purse seine method of fishing violates the International Dolphin Conservation Program Act ("IDCPA") and therefore is not in accordance with law; (2) that the environmental assessment prepared by NMFS violated the National Environmental Policy Act ("NEPA") and applicable regulations and that NMFS should have completed an environmental impact statement for the tuna/dolphin program under review; and (3) that the affirmative findings of Commerce that lifted the United States' tuna embargo against Mexico violated the IDCPA.[2] As relief, Plaintiffs sought a declaratory judgment that the government violated the IDCPA and NEPA through its administrative determinations, a remand to Commerce with instructions to issue a revised proposed rule, and an order to Commerce to complete an environmental impact statement on the tuna/dolphin program.
 
 
 2
 On December 7, 2001, the Court of International Trade denied Plaintiffs' motion for summary judgment on the administrative record and entered judgment in favor of the government. Defenders of Wildlife v. Hogarth, 177 F.Supp.2d 1336 (Ct. Int'l Trade 2001). The court held that the Interim-Final Rule was in accordance with the IDCPA and that Commerce had not violated NEPA. Id. at 1367. Plaintiffs now appeal.[3] We affirm.
 
 BACKGROUND
 I. The ETP and Purse Seine Fishing
 
 3
 The ETP is a seven million square mile stretch of ocean that runs from the coast of California to the coast of Peru. It is host to numerous species of wildlife, including yellowfin tuna and dolphins. One quarter of the world's tuna catch occurs in the ETP; of all the tuna caught in the ETP, yellowfin tuna is the most economically significant species.
 
 
 4
 A unique synergy exists in the ETP between schools of yellowfin tuna and groups of dolphins. Yellowfin tuna inexplicably aggregate in large numbers beneath dolphin schools. Fishermen, seeking to exploit this synergy, devised a method of catching yellowfin tuna called purse seine fishing. Purse seine fishing is based on the principle that dolphins must break the surface of the water to breathe every several minutes, allowing fishermen to easily identify and locate groups of dolphins. Once a large dolphin group is located, fishermen use motorboats, explosives, and helicopters to chase the dolphins for extended periods in an attempt to exhaust them.
 
 
 5
 Eventually, the group is herded into a small area, where the fishermen first surround the dolphins and the submerged yellowfin tuna with an immense fishing net, called a purse seine, and then draw the bottom of the net together to trap the tuna. The fishermen then haul the net on board to recover the tuna. Dolphins are released through a "backdown" procedure, which takes place when the fishermen reverse the vessel's direction after approximately one-half of the purse seine net has been rolled onboard. Purse seine fishing results in the drowning deaths of dolphins that become entangled in the net. From 1959 to 1972, millions of dolphins were killed in this manner, and public outcry prompted Congress to pass legislation banning purse seine fishing.
 
 II. Statutes and International Agreements
 
 6
 In 1972, Congress passed the Marine Mammal Protection Act ("MMPA"). The MMPA required that all marine mammal populations be managed to maintain their "optimum sustainable population." Marine Mammal Protection Act, Pub.L. No. 92-522, 86 Stat. 1027 (1972) (codified as amended at 16 U.S.C. § 1361). The MMPA created "a moratorium on the taking and importation of marine mammals...," except that marine mammals were permitted to be taken "incidentally in the course of commercial fishing operations" and permits allowing such incidental taking could be issued pursuant to the provisions of the MMPA. Id. at 1029-30 (codified at 16 U.S.C. § 1371(a)). However, no permit could be issued for the taking of any marine mammal which had been designated by the Secretary as "depleted." Id. at 1031 (codified at 16 U.S.C. § 1371(a)(3)(B)). The MMPA further directed the Secretary of the Treasury to "ban the importation of commercial fish or products from fish which have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of the United States standards." Id. at 1030 (codified at 16 U.S.C. § 1371(a)(2)). Upon conducting research required by the MMPA, the NMFS concluded that three dolphin stocks were depleted in the ETP: the coastal dolphin, the northeastern offshore spotted dolphin, and the eastern spinner dolphin. Regulation Governing the Taking and Importing of Marine Mammals, 42 Fed.Reg. 64,548-60 (1977); Taking and Importing of Marine Mammals; Listing of the Northeastern Offshore Spotted Dolphin as Depleted, 58 Fed.Reg. 58,285 (1993); Taking and Importing of Marine Mammals; Listing of the Eastern Spinner Dolphin as Depleted, 58 Fed.Reg. 46,006 (1993).
 
 
 7
 In 1988, Congress enacted the MMPA Amendments of 1988, Pub.L. No. 100-711, 102 Stat. 4755 (1988). The amendments specified criteria for allowing access to the United States market by tuna-harvesting nations and imposed embargoes on tuna imports from countries, including Mexico, that failed to meet those criteria. Id. Thereafter, in 1990, Congress enacted the Dolphin Protection Consumer Information Act, Pub.L. No. 101-627, § 901, 104 Stat. 4436, 4465 (1990), which established "dolphin safe" labeling standards and made it a violation of the Federal Trade Commission Act to label a product as "dolphin safe" if it contained (1) tuna harvested on the high seas by a vessel engaging in drift net fishing or (2) tuna harvested in the ETP by a vessel using the purse seine method, unless the tuna product was accompanied by various statements demonstrating that no dolphins were intentionally encircled during the trip in which the tuna was caught. Id. § 901(d), 104 Stat. at 4466.
 
 
 8
 In 1992, the United States entered into a non-binding international agreement ("La Jolla Agreement"), which negotiated the creation of the International Dolphin Conservation Program ("IDCP"). The La Jolla Agreement stated that its objectives were to "progressively reduc[e] dolphin mortality in the eastern Pacific Ocean ... fishery to levels approaching zero through the setting of annual limits and ... with a goal of eliminating dolphin mortality in this fishery...." La Jolla Agreement, Apr. 23, 1992, Appendix 10
 
 
 9
 In 1995, the United States and eleven other countries signed the Panama Declaration, which formalized the La Jolla Agreement into a binding agreement. The purpose of the Panama Declaration was to strengthen the protection of dolphins by (1) reducing dolphin mortality in the ETP to levels approaching zero; (2) establishing annual dolphin mortality limits ("DML"); (3) creating incentives for vessel captains to further reduce dolphin mortality; and (4) establishing measures to avoid bycatch. Declaration of Panama, Oct. 4, 1995. The Panama Declaration is not self-executing. Consequently, it could not become legally binding domestically unless Congress implemented it through domestic legislation. Cf. Trans World Airlines, Inc. v. Franklin Mint Corp., 466 U.S. 243, 244, 104 S.Ct. 1776, 80 L.Ed.2d 273 (1984) ("Since the Convention is a self-executing treaty, no domestic legislation is required to give it the force of law in the United States.").
 
 
 10
 In 1997, Congress passed the IDCPA, Pub.L. No. 105-42, 111 Stat. 1122 (1997) (codified at 16 U.S.C. §§ 1371 & 1411), which implemented certain provisions of the Panama Declaration. The IDCPA revised the MMPA and provided new import criteria for tuna products. Under the IDCPA, a nation is allowed to import tuna into the United States if it provides documentary evidence that (1) it participates in the IDCP and is a member of the Inter-American Tropical Tuna Commission, (2) it meets its obligations under the IDCP and is a member of the Commission, and (3) it does not exceed specified DMLs. 16 U.S.C. § 1371(a)(2)(B) (2000).
 
 III. The Interim-Final Rule
 
 11
 In the IDCPA, Congress charged the Secretary of Commerce with drafting implementing regulations. 16 U.S.C. § 1413 (2000). Additionally, the Act directed the Secretary of State to procure a legally binding instrument establishing the IDCP, which the Secretary did through an executive agreement, the Agreement on the International Dolphin Conservation Program (the "International Agreement"). Id. § 1412.
 
 
 12
 On June 14, 1999, Commerce published a proposed rule to implement the IDCPA. Taking of Marine Mammals Incidental to Commercial Fishing Operations: Tuna Purse Seine Vessels in the Eastern Tropical Pacific Ocean (ETP), 64 Fed.Reg. 31,806 (June 14, 1999) ("Proposed Rule"). Commerce accepted public comment until July 14, 1999, during which time several of the Plaintiffs submitted written comments. Subsequently, Commerce published its interim-final rule. Taking of Marine Mammals Incidental to Commercial Fishing Operations: Tuna Purse Seine Vessels in the Eastern Tropical Pacific Ocean (ETP), 65 Fed.Reg. 30 (Jan. 3, 1999) ("Interim-Final Rule").
 
 
 13
 The IDCPA directed the Secretary to issue regulations to implement the IDCP and to govern the taking of marine mammals in the ETP. 16 U.S.C. § 1413(a). The IDCPA specified provisions that were to be included in the implementing regulations, such as requiring observers on each vessel, ensuring that backdown has begun thirty minutes before sundown, and establishing DMLs. Id. § 1413(a)(2)(B). At issue in this case is the Interim-Final Rule's provision relating to the backdown procedures. The Interim-Final Rule states, in relevant part, that "[o]n every set encircling dolphin, the backdown procedure must be completed no later than one-half hour after sundown...." 50 C.F.R. § 216.24(c)(6)(iii), 65 Fed.Reg. at 51 (emphasis added).
 
 
 14
 During the process of rule making, NMFS was also preparing an environmental assessment. As explained more fully below, under NEPA, all federal agencies must "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment," an assessment of the environmental impact through an environmental impact statement. 42 U.S.C. § 4332(2)(C) (2000). In order to determine whether an environmental impact statement is necessary, agencies prepare environmental assessments addressing the proposal's or action's impact on the human environment. NMFS's environmental assessment was designed to determine the impact of the Interim-Final Rule on the human environment. It considered three alternatives: (1) the status quo under MMPA; (2) the Interim-Final Rule as proposed; and (3) an adjusted version of the Interim-Final Rule that required backdown to begin thirty minutes before sundown. NMFS found with respect to alternative number two that:
 
 
 15
 allowing large U.S. purse seine vessels to deploy a net on or encircle dolphins in the course of tuna purse seine fishing in the ETP and allowing the import of yellowfin tuna catch in this manner from [the] ETP tuna purse seine fishery should not have a significant impact on any dolphin stocks in the ETP.
 
 
 16
 Environmental Assessment of Interim-Final Rule to Implement the International Dolphin Conservation Program Act (P.L. 105-42) and Regulatory Impact Review 48 (1999) ("Environmental Assessment"). The environmental assessment resulted in a finding of no significant impact with respect to alternative number two. Id. at 58. Therefore, NMFS decided not to prepare an environmental impact statement.
 
 
 17
 IV. Proceedings in the Court of International Trade
 
 
 18
 On February 8, 2000, Plaintiffs filed suit in the Court of International Trade, alleging that the Interim-Final Rule was contrary to the IDCPA and therefore not in accordance with law. Plaintiffs contended that the provision of the Interim-Final Rule relating to backdown procedures was contrary to the IDCPA, because the statute required backdown to be completed one-half hour before sunset. In addition, Plaintiffs alleged that the environmental assessment prepared by NMFS was defective and violated NEPA and that an environmental impact statement should have been prepared. Plaintiffs also alleged that the findings made by the Secretary of Commerce with regard to Mexico were not in accordance with the IDCPA and therefore did not support the lifting of the tuna embargo against Mexico. The Court of International Trade exercised jurisdiction pursuant to 28 U.S.C. § 1581(i)(3), which provides that "the Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for ... (3) embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety...." See Turtle Island Restoration Network v. Evans, 284 F.3d 1282, 1287 (Fed.Cir.2002).
 
 
 19
 On February 28, 2001, Plaintiffs moved for summary judgment on the administrative record and sought a declaratory judgment that the agency action promulgating the Interim-Final Rule violated both the IDCPA and NEPA. The government opposed Plaintiffs' motion, but did not cross-move for summary judgment.
 
 
 20
 Reviewing NMFS's rule making under the "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" standard of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), the Court of International Trade denied Plaintiffs' summary judgment motion and entered judgment for the government dismissing the complaint. Defenders of Wildlife, 177 F.Supp.2d at 1373. The court concluded that the IDCPA includes a statutory mistake in 16 U.S.C. § 1413(a)(2)(B)(v), where it states that all backdown procedures during sets of purse seine on marine mammals must be completed no later than one-half hour before sundown. Id. at 1345. The court further concluded that this statutory mistake resulted in an inconsistency between the IDCPA and the Interim-Final Rule that, when corrected, properly expressed the intent of Congress. Id. The court also concluded that NMFS's decision not to prepare an environmental impact statement was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Id. at 1359. Finally, the court upheld the lifting of the Mexican embargo. Id. at 1367. Plaintiffs now appeal.[4] We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).
 
 ANALYSIS
 I. Standard of Review
 
 21
 Summary judgment is appropriate where the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." U.S.Ct. of Int'l Trade R. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). We review the Court of International Trade's summary judgment ruling upon the administrative record de novo and without deference to the court. Int'l Light Metals v. United States, 194 F.3d 1355, 1361 (Fed. Cir.1999). We therefore apply the same standard as the Court of International Trade, holding "unlawful and set[ting] aside agency action, findings, and conclusions found to be — (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...." 5 U.S.C. § 706(2)(A). Statutory interpretation is a matter of law that we review de novo without regard to the interpretation reached by the Court of International Trade. SKF USA Inc. v. United States, 263 F.3d 1369, 1378 (Fed.Cir.2001).
 
 
 22
 On appeal, Plaintiffs make essentially two arguments. First, they challenge the court's decision that the Interim-Final Rule is consistent with the IDCPA. Second, they urge us to reject the court's decision that the government did not violate NEPA in promulgating the Interim-Final Rule without preparing an environmental impact statement. We address these contentions in turn.
 
 II. Sunset Rule
 
 23
 The IDCPA states that the regulations promulgated under 16 U.S.C. § 1413 must "ensur[e] that the backdown procedure during sets of purse seine net on marine mammals is completed and rolling of the net to sack up has begun no later than 30 minutes before sundown...." 16 U.S.C. § 1413(a)(2)(B)(v) (emphasis added). The Interim-Final Rule, on the other hand, states that "[o]n every set encircling dolphin, the backdown procedure must be completed no later than one-half hour after sundown...." 50 C.F.R. § 216.24(c)(6)(iii) (emphasis added) ("Sunset Rule").
 
 
 24
 The Court of International Trade acknowledged that the provision of the Interim-Final Rule relating to sundown sets was contrary to the language of the IDCPA. However, the court stated: "Although the language of the regulation does appear to conflict with the express statutory language regarding sundown sets, it does not conflict with the intent of Congress." Defenders of Wildlife, 177 F.Supp.2d at 1345. In reaching this conclusion, the court pointed to "[p]rior legislation that is part of the same legislative scheme to protect dolphins, legislative history, practical considerations and the International Agreement" as indicating that "Congress intended to use the word `after' rather than `before,' to establish the cut-off period for sundown sets." Id. at 1346. The court noted several points. First, prior to the enactment of the 1988 amendments to the MMPA, "the Committee on Merchant Marine and Fisheries stated that `the back-down procedures would be completed and the net would be close to the seine vessel by 30 minutes after sundown....' H.R.Rep. No. 100-970, at 31 (1988), reprinted in 1988 U.S.C.C.A.N. 6154, 6172 (emphasis added)." Id. Second, the court noted that, in the 1988 amendments, "Congress directed Commerce to `prescribe regulations to ensure that the backdown procedure during sets of the purse seine net on marine mammals is completed and rolling of the net to sack up has begun no later than thirty minutes after sundown.' Pub.L. No. 100-711, § 4, 102 Stat. 4755, 4767 (1988) (emphasis added)." Id. In addition, the court observed that Annex VIII to the International Agreement on the IDCP "provides that a tuna boat operating in the Agreement Area must `complete backdown no later than thirty minutes after sunset.' Annex VIII.3.e (emphasis added)." Id. Finally, the court stated that employing a thirty minute after sundown standard made practical sense because of the difficulty a ship at sea would have in calculating the time of sundown in order to complete backdown thirty minutes before that time, whereas thirty minutes after sundown could be calculated based upon the observable phenomenon of sundown itself. Id. In short, the Court of International Trade concluded that the use of the word "before" in the statute represented a drafting error because it did not represent a true expression of Congress' intent. Id. Consequently, the court held that the provision in the Interim-Final Rule on sundown sets was not contrary to law. Id.
 
 
 25
 Plaintiffs argue that the Interim-Final Rule promulgated by NMFS is not in accordance with the IDCPA. Specifically, they contend that NMFS's rule is contrary to the plain language of the statute and that NMFS's rule frustrates the intent of Congress vis-à-vis dolphin protection. In response, the government asserts that Congress' use of the word "before" is an inadvertent drafting mistake that should be corrected by the court. Alternatively, the government argues that Congress authorized Commerce to alter, in its discretion, the requirements of the statute so long as the alterations are consistent with the IDCP established by the State Department in the International Agreement.
 
 
 26
 In determining whether an agency's regulatory interpretation of a statute is lawful, courts rely on Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). A court must first determine whether "Congress has directly spoken to the precise question at issue." Id. at 842, 104 S.Ct. 2778. If Congress' intent is ascertainable, we need not reach the issue of Chevron deference, but "must give effect to the unambiguously expressed intent of Congress." Id. at 843, 104 S.Ct. 2778. If Congress has not spoken directly to the issue, the court must determine if the agency's interpretation "is based on a permissible construction of the statute." Id.
 
 
 27
 Deciphering the intent of Congress begins with the text of the statute. Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999) ("As in any case of statutory construction, our analysis begins with the language of the statute." (internal quotation marks omitted)). Accordingly, we begin our inquiry into the meaning of the IDCPA with the language of the statute itself. The statute could not be clearer in its use of the term "before," and since the statute does not define or limit the term "before," we presume Congress intended to give that term its ordinary meaning. Asgrow Seed Co. v. Winterboer, 513 U.S. 179, 187, 115 S.Ct. 788, 130 L.Ed.2d 682 (1995). The Interim-Final Rule is also clear in its use of the word "after" and, as such, directly conflicts with the statute. In this case, the language of the statute represents a clear statement of Congress' intent. Chevron, 467 U.S. at 842, 104 S.Ct. 2778 ("Where Congress has directly spoken to the precise question at issue," we do not reach Chevron deference.).
 
 
 28
 As noted, however, the Court of International Trade concluded that the word "before" in the IDCPA represented a drafting mistake on the part of Congress. The government, relying on Bohac v. Department of Agriculture, 239 F.3d 1334 (Fed. Cir.2001), contends that a court may change the meaning of the words of a statute in the face of an obvious mistake. It urges us to change the word "before" in the IDCPA to "after" based on the doctrine of mistake.
 
 
 29
 In Bohac, the statute at issue granted successful plaintiffs "any other reasonable and foreseeable consequential changes." Id. at 1337 (emphasis added). It was clear from the face of the statute that the word "changes" made no sense, and accordingly, the court altered the meaning to be "any other reasonable and foreseeable consequential damages." Id. (emphasis added). Bohac and other cases that resort to the doctrine of mistake largely involve mistakes that are clear from the text of the statute. See United States Nat'l Bank v. Indep. Ins. Agents of Am., 508 U.S. 439, 462, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993) ("In these unusual cases, we are convinced that the placement of the quotation marks in the 1916 Act was a simple scrivener's error, a mistake made by someone unfamiliar with the law's object and design."). It is not clear from the face of the IDCPA, however, that the word "before" is a drafting error.
 
 
 30
 As did the Court of International Trade, the government takes the position that Congress intended to use the word "after" instead of "before" based upon the fact that a prior legislative enactment, the 1988 amendments to the MMPA, required the backdown procedure to be completed one-half hour after the sun has set. As did the Court of International Trade, the government also relies on the statutory scheme of the IDCPA, where Congress directed the State Department to negotiate and implement an International Agreement without returning to Congress for approval, to suggest that Congress intended the international standard to govern the implementing regulations.
 
 
 31
 In order to construe a statute contrary to the plain meaning of its text, the government must show a clear contrary intent by Congress that supports its construction. Garcia v. United States, 469 U.S. 70, 75, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984) ("[O]nly the most extraordinary showing of contrary intentions from [the legislative history] would justify a limitation on the `plain meaning' of the statutory language."). A prior statutory enactment by Congress is not indicative of the changes that Congress is likely to make at a later time. The government's argument ignores the fact that Congress may change the meaning of a statute from past provisions. Congress' prior use of the word "after" imports no additional information with respect to whether the change to the word "before" was intentional or an unintentional mistake. Additionally, the Supremacy Clause mandates that a statute is supreme over an executive agreement, such as the International Agreement on the IDCP. U.S. Const. art. VI, § 1, cl. 2. Congress, therefore, could not have intended, without more, for the International Agreement to govern the implementation of the regulations. The IDCPA clearly requires that the backdown procedure be completed one-half hour before sunset.
 
 
 32
 We find more persuasive the government's second argument. The IDCPA states that "[t]he Secretary may make such adjustments as may be appropriate to requirements of subparagraph (B) that pertain to fishing gear, vessel equipment, and fishing practices to the extent the adjustments are consistent with the International Dolphin Conservation Program." 16 U.S.C. § 1413(a)(2)(C). The government argues that the period for permissible sundown sets is a "fishing practice" and that it was entitled to alter its regulation consistent with the IDCP.
 
 
 33
 Section 1413(a)(2)(C) grants Commerce the authority to make adjustments to the requirements of the IDCPA in certain circumstances.[5] We conclude that, under the current set of circumstances, NMFS was authorized to alter the backdown procedure in the IDCPA. The period for permissible sundown sets is a fishing practice subject to section 1413(a)(2)(C). Moreover, the International Agreement creating the IDCP states that the backdown procedure must be completed no later than one half hour after sunset. Agreement on the International Dolphin Conservation Program, May 21, 1998, Annex VIII.3.e. In view of section 1413(a)(2)(C), NMFS was authorized to draft the Interim-Final Rule in a manner consistent with the IDCP. NMFS's decision to adopt the "one-half hour after sundown" standard, therefore, is in accordance with the letter of the law.
 
 
 34
 Plaintiffs object to this approach, however, because Commerce did not rely on section 1413(a)(2)(C) in promulgating the Interim-Final Rule. Plaintiffs thus raise a Chenery issue. See SEC v. Chenery Corp., 318 U.S. 80, 94, 63 S.Ct. 454, 87 L.Ed. 626 (1943) ("If the action rests upon an administrative determination — an exercise of judgment in an area which Congress has entrusted to the agency — of course it must not be set aside because the reviewing court might have made a different determination were it empowered to do so."). Chenery stands for the proposition that a court may not make its own factual findings to support an agency's determination. Id. Factual findings are properly left to the agency that oversees a statute. Id.
 
 
 35
 In this case, there is not a Chenery problem for two reasons. First, in NMFS's response to Comment 81 to the Proposed Rule, NMFS relied on the International Agreement creating the IDCP as support for the Interim-Final Rule and relied on the fact that the Interim-Final Rule is consistent with the International Agreement. See Taking of Marine Mammals Incidental to Commercial Fishing Operations; Tuna Purse Seine Vessels in the Eastern Tropical Pacific Ocean (ETP), 65 Fed.Reg. at 39. Second, we are not required to make additional factual findings, as was the case in Chenery. See Fleshman v. West, 138 F.3d 1429, 1433 (Fed.Cir. 1998) ("[T]he doctrine does not prohibit a reviewing court from affirming an agency decision on a ground different from the one used by the agency if the new ground is not one that calls for `a determination or judgment which an administrative agency alone is authorized to make,'" and "the doctrine does not require a remand to the agency if it is clear that `the agency would have reached the same ultimate result' had it considered the new ground.") (citations omitted). Rather, we are called upon to determine whether NMFS had the authority under 16 U.S.C. § 1413(a)(2)(C) to issue the Interim-Final Rule as drafted. In this case, NMFS already has exercised its discretion to draft the Interim-Final Rule consistently with the IDCP. For that reason, we conclude that the agency would have reached the same conclusion had it addressed the legal issue on which we rest our judgment. The government's analysis, therefore, does not run afoul of Chenery. We therefore will not disturb the decision of the Court of International Trade that the Interim-Final Rule's Sunset Rule does not conflict with the IDCPA.
 
 III. NEPA Challenge
 
 36
 The Court of International Trade rejected Plaintiffs' argument that, in promulgating the Interim-Final Rule, NMFS violated NEPA. Defenders of Wildlife, 177 F.Supp.2d at 1360. The court held that the government's decision not to prepare an environmental impact statement for the Interim-Final Rule was not arbitrary or capricious. Id. at 1359. The court concluded that "Defenders fail[ed] to show the court that the NMFS committed error in preparing the [environmental assessment], and certainly fail[ed] to convince the court that the [environmental assessment] is defective and represents an abuse of agency discretion." Id. at 1360.
 
 
 37
 As they did in the Court of International Trade, Plaintiffs contend that, in promulgating the Interim-Final Rule, Commerce violated NEPA. Specifically, Plaintiffs assert that NMFS's decision not to prepare an environmental impact statement was arbitrary and capricious because its environmental assessment for the Interim-Final Rule was deficient. Plaintiffs level essentially four charges at the environmental assessment: (1) that it was based upon inaccurate and dated information; (2) that it erroneously took a piecemeal approach and failed to consider the cumulative effects on the dolphin population of various environmental impacts; (3) that it failed to address certain problems with the dolphin safe-label program; and (4) that it was flawed because of the lack of public participation in the process.
 
 
 38
 The government responds that NMFS's environmental assessment was thorough and complete. The government claims that it properly delineated the affected environment, that it considered reasonable alternatives, and that it analyzed the environmental effects of each of the alternatives. Moreover, it argues, NMFS's decision not to file an environmental impact statement for the Interim-Final Rule was not arbitrary or capricious.
 
 
 39
 NEPA requires all federal agencies to prepare an environmental impact statement on all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The environmental impact statement requirement ensures that agencies take a "hard look" at the environmental consequences of their actions and at possible alternatives. Kleppe v. Sierra Club, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). Each agency is responsible for its own compliance with NEPA. Congress, however, created a central agency, the Council on Environmental Quality ("CEQ"), to coordinate agencies' compliance with NEPA, and CEQ promulgated regulations for implementing NEPA that are binding on all agencies. 40 C.F.R. § 1500. These regulations help agencies determine whether an environmental impact statement is required.
 
 
 40
 When an agency decides whether or not to prepare an environmental impact statement, it creates an environmental assessment. Through the environmental assessment, the agency considers whether the action it is taking is a major federal action and whether it significantly affects the human environment. 42 U.S.C. § 4332(2)(C). If an agency determines on the basis of its environmental assessment that it need not prepare an environmental impact statement, it must make a finding of no significant impact and support it with a statement of reasons why the impact of its proposed action is insignificant. 40 C.F.R. § 1501.4. In addition, the finding of no significant impact must be made available to the impacted public. Id.
 
 
 41
 The CEQ regulations direct agencies to determine whether the proposed action is one that normally requires an environmental impact statement or normally does not require an environmental impact statement. Id. In this case, the NOAA promulgated procedures stating that the issuance of rules that affect the taking of marine mammals are actions that normally require an environmental assessment, but not necessarily an environmental impact statement. Environmental Review Procedures for Implementing the National Environmental Policy Act § 6.03(f)(1) (1999), available at http://www.rdc.noaa.gov/ nao/216-6.html (last modified May 20, 1999).
 
 
 42
 In scrutinizing an agency's determination of no significant impact, courts look to the four-part test laid out in Sierra Club v. Peterson, 717 F.2d 1409, 1413 (D.C.Cir. 1983). First, the court must ascertain if the agency took a "hard look" at the environmental problem. Id. Second, the court must determine if the agency identified the relevant areas of environmental concern. Id. Third, the court must determine whether the agency made a convincing case that the impact was insignificant. Id. Finally, the court must decide whether the agency sufficiently minimized any impact. Id. A decision not to prepare an environmental impact statement should only be set aside if the decision is found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Id.; cf. Marsh v. Or. Natural Res. Council, 490 U.S. 360, 375, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Moreover, the scope of review is limited to the administrative record. Id.
 
 
 43
 We begin with the premise that, through the IDCPA, Congress chose to permit fishermen to import and sell in the United States tuna caught by the purse seine method of fishing. Congressional determinations, such as this, are not subject to the requirements of NEPA. Instead, we must decide whether NMFS, in deciding whether to prepare an environmental impact statement, took a "hard look" at the dolphin mortality problem and at the effect of the Interim-Final Rule that implemented Congress' determinations.
 
 
 44
 In this case, NMFS identified the relevant areas of environmental concern. It took a hard look at the dolphin mortality problem, and it established that there was not a significant impact posed by its regulations. NMFS defined the affected environment as the physical environment, the biological environment, tuna purse seine fishing in the ETP, and the economic environment. Environmental Assessment at 16-40. Moreover, NMFS compared the impacts of three alternatives. The IDCPA included many requirements for the regulations, and therefore, the alternatives that NMFS could consider were restricted. See 16 U.S.C. § 1413(a)(2)(B)(i)-(xii). We hold that NMFS complied with NEPA and reasonably exercised its discretion in reaching its finding of no significant impact. We consider each of Plaintiffs' arguments to the contrary in turn.
 
 
 45
 Plaintiffs' arguments generally revolve around their contention that NMFS failed to consider how the physiological stress of the extended chase preceding encirclement, mother/calf separation, and the under-reporting of direct kills by ship captains would hinder the dolphin populations' recovery. Plaintiffs contend that NMFS failed to take a "hard look" at these environmental impacts and therefore improperly concluded that there would be no significant impact.
 
 A. Inaccurate and Dated Information
 
 46
 The IDCPA directed Commerce to report on "the effect of intentional encirclement (including chase) on dolphins and dolphin stocks incidentally taken in the course of purse seine fishing for yellowfin tuna in the eastern tropical Pacific Ocean." 16 U.S.C. § 1414a(a)(1) & (4). On March 25, 1999, NMFS submitted a report ("1999 Report") to Congress. The 1999 Report concluded that the northeastern offshore spotted dolphin population and the eastern spinner dolphin population were "not increasing at the rate expected based on the low rate of reported mortalities from the fishery since 1991 and the reproductive potential for these populations." 1999 Report, at vi. In the 1999 Report, NMFS considered non-fishery and fishery-related explanations for the populations' failure to recover and ruled out the possibility of large-scale environmental changes that could have affected the populations. It turned instead to fishery-related explanations and, in particular, stress caused by an extenuated chase, separation of calves from their mothers as a result of the chase, and under-reporting of direct kills by fishing captains. NMFS concluded that the "information suggests but by no means conclusively that the fishery has been the source of significant adverse impact on these two populations." Id. at 22.
 
 
 47
 Plaintiffs contend that NMFS did not consider the 1999 Report when it determined that "all stocks, including the depleted eastern spinner stock and the northeastern offshore spotted stock, are stable or slightly increasing...." Environmental Assessment at 42. Plaintiffs also contend that NMFS failed to cite or consider four research papers prepared for the report: (1) Curry, B.E., Stress in Mammals: The Potential Influence of Fishery-Induced Stress on Dolphins in the Eastern Tropical Pacific Ocean; (2) Fiedler, P.C., Eastern Tropical Pacific Dolphin Habitat Variability; (3) Gerrodette, T., Preliminary Estimates of 1998 Abundance of Four Dolphin Stocks in the Eastern Tropical Pacific; and (4) Goodman, D., Decision Framework for Assessing the Status of the Eastern Tropical Pacific Dolphin Stocks. Plaintiffs argue that these papers represented the highest quality information prepared by NMFS's own staff at the time the environmental assessment was being prepared and that the papers and the 1999 Report were all consistent with each other. Plaintiffs conclude that NMFS's failure to consider these documents rendered its environmental assessment arbitrary and capricious.
 
 
 48
 NMFS's failure to cite the 1999 Report and the four research papers does not mean that NMFS did not consider them. It means only that NMFS did not specifically rely on them to reach its finding of no significant impact. The choice of what information to rely upon is properly within the discretion of the agency, and the decision not to rely on a specific report does not render the environmental impact arbitrary and capricious.
 
 
 49
 B. Cumulative Effects Under Regulatory Actions
 
 
 50
 Plaintiffs further argue that NMFS illegally separated its environmental assessment for the Interim-Final Rule from the environmental assessment for three earlier regulatory actions and failed to consider the cumulative effects of these earlier regulatory actions on the dolphin populations. The earlier regulatory actions for which environmental assessments were prepared are as follows: (1) Regulations to Implement Management and Conservation Measures Under the Pacific Tunas Conventions Act (1999); (2) Measures to Reduce Bycatch by U.S. Vessels in the ETP Purse Seine Fisheries and Information Collection for a Regional Vessel Register (2000); and (3) Chase-Recapture Experiment Under the International Dolphin Conservation Program Act (2001). Plaintiffs claim that the Interim-Final Rule and these regulatory actions were closely related in subject matter and time and that all four actions should have been considered together in a single environmental assessment, as required by the CEQ. See 40 C.F.R. § 1502.4(a) ("Proposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement."); see also id. § 1508.25(a)(2); Kleppe, 427 U.S. at 409-10, 96 S.Ct. 2718. We are not persuaded by this argument.
 
 
 51
 Plaintiffs' statement that "the subject matter in all four of these [environmental assessments] possess obvious synergies...." is not enough, without more, to show that the Interim-Final Rule and the three cited actions were so closely related to each other that they comprised a single course of action requiring a single environmental assessment. See Kleppe, 427 U.S. at 412, 96 S.Ct. 2718 ("The determination of the region, if any, with respect to which a comprehensive statement is necessary requires the weighing of a number of relevant factors, including the extent of the interrelationship among proposed actions and practical considerations of feasibility. Resolving these issues requires a high level of technical expertise and is properly left to the informed discretion of the responsible federal agencies."). Absent a showing by the Plaintiffs of arbitrary action, we must assume that NMFS appropriately exercised its discretion by considering the Interim-Final Rule alone in this environmental assessment.
 
 C. Dolphin-Safe Tuna Label
 
 52
 In May of 1999, Commerce published an initial finding regarding the impact of the intentional encirclement of dolphin in the ETP, concluding that "there is insufficient evidence that the chase and encirclement by tuna purse seine fishery `is having a significant impact' on depleted dolphin stocks in the ETP." Taking of Marine Mammals Incident to Commercial Fishing Operation; Tuna Purse Seine Vessels in the Eastern Tropical Pacific Ocean (ETP); Initial Finding, 64 Fed.Reg. 24,590-91 (May 7, 1999) ("Initial Finding").[6] The Secretary's finding that the intentional encirclement of dolphins was not having a significant adverse impact on any depleted stock of dolphin automatically triggered a change in the "dolphin safe" labeling standard. See 16 U.S.C. § 1385(d) & (h)(2). The new standard allows tuna products that contain tuna harvested in the ETP to carry the dolphin safe mark (1) if the tuna was caught on a vessel that was not capable of deploying purse seine nets on dolphins or (2) if a certification accompanies the product stating that "no dolphins were killed or seriously injured during the sets in which the tuna were caught." Id. § 1385(d)(2) & (h)(1).
 
 
 53
 The Secretary's Initial Finding was challenged in the United States District Court for the Northern District of California, where the district court found that the Initial Finding was contrary to law and an abuse of the Secretary's discretion. Brower v. Daley, 93 F.Supp.2d 1071 (N.D.Cal. 2000). In affirming, the Ninth Circuit stated that, based upon the research conducted by NMFS, "all of the evidence indicated that dolphins are adversely impacted by the fishery." Brower v. Evans, 257 F.3d 1058, 1071 (9th Cir.2001). The court struck down the Initial Finding, causing the dolphin safe labeling standard to automatically revert to the original standard embodied in 16 U.S.C. § 1385(h)(2).[7]
 
 
 54
 Plaintiffs argue that the environmental assessment failed to address several problems with the dolphin safe-label program. Specifically, they contend that the Ninth Circuit's holding in Brower is inconsistent with NMFS's finding of no significant impact in the environmental assessment. Brower, however, interpreted the provisions in 16 U.S.C. § 1385(g) regarding the Secretary's initial finding requirement and then considered the sufficiency of the Secretary's Initial Finding. Brower did not address the question involved here, i.e., whether NMFS's finding that the Interim-Final Rule does not pose a significant impact to the affected environment was arbitrary or capricious.
 
 
 55
 Plaintiffs also argue that NMFS prepared the environmental assessment based on fundamentally incorrect assumptions, including the assumption that the dolphin safe labeling standard would change and the assumption that Customs would be able to regulate which tuna may properly be imported into the United States. Plaintiffs contend that these assumptions are flawed and that the reliability of the environmental assessment is undermined. Moreover, Plaintiffs argue that these assumptions violate the "high quality information" and "excellent action" requirements in 40 C.F.R. § 1500.1.[8] Plaintiffs, however, fail to establish how these concerns would affect NMFS's analysis of the impact on the dolphin populations or how they render the environmental assessment arbitrary. Rather, they only support Plaintiff's contention that consumers will not know whether the tuna they purchase is caught in a manner that is truly safe for dolphin populations. These arguments are not sufficient to render NMFS's finding that there is no significant impact to the human environment arbitrary or capricious.[9]
 
 
 56
 D. Participation by the Public, State Department, Department of Treasury, and Customs Service
 
 
 57
 Finally, Plaintiffs argue that the environmental assessment is flawed because of the lack of public participation in the process and the lack of participation by the State Department, Department of Treasury, and/or Customs Service.[10] Specifically, Plaintiffs contend that the public should have been given the opportunity to comment on the proposed environmental assessment.
 
 
 58
 Public participation is required by the CEQ regulations if the proposed action is without precedent or is similar to an action that normally requires preparation of an environmental impact statement. 40 C.F.R. § 1501.4(e)(2). In such cases, an agency must make its proposed finding of no significant impact available for public review thirty days before the agency makes its final determination whether to prepare an environmental impact statement. Id. The government argues that the two circumstances requiring public review were not present here. It cites the 1999 environmental assessment of regulations that implemented the Pacific Tunas Conventions Act, which resulted in a finding of no significant impact, to suggest that the Interim-Final Rule is not the type of action that normally results in an environmental impact statement. For their part, Plaintiffs point to the 1980 implementing regulations for the MMPA that resulted in an environmental impact statement. The Court of International Trade found that NMFS's environmental assessment was not a functional equivalent of an environmental impact statement and that therefore there was no need for a public comment period on the draft environmental assessment. Defenders of Wildlife, 177 F.Supp.2d at 1364. We agree. The two agency implementing regulations, the Pacific Tunas Conventions Act implementing regulations, see 50 C.F.R. § 300 (2000), which resulted in a finding of no significant impact, and the 1980 implementing regulations for the MMPA, see 50 C.F.R. § 216.24 (1980), which resulted in an environmental impact statement, suggest that this type of action does not always result in an environmental impact statement, and therefore NMFS was not required to publish its finding of no significant impact thirty days prior to the agency's final determination.
 
 
 59
 Plaintiffs also argue that the State Department as well as the Department of the Treasury and/or the Customs Service should have been involved in the preparation of the environmental assessment. We disagree. NMFS's environmental assessment took into consideration the views and concerns of the State Department and the Customs Service. See Environmental Assessment at 53-54; 65 Fed.Reg. at 41 cmt. 96. Plaintiffs, therefore, have not convinced the court that NMFS acted improperly in preparing its environmental assessment.
 
 
 60
 We hold that NMFS complied with the law and reasonably exercised its discretion as far as the NEPA process is concerned. NMFS took a "hard look" at the dolphin mortality problem and the effects of the Interim-Final Rule on the environment, and NMFS considered the relevant areas impacted by its regulation. Additionally, NMFS found that the preferred Interim-Final Rule would not have a significant impact on the dolphin stock in the ETP. NMFS's decision not to prepare an environmental impact statement was not arbitrary or capricious.
 
 CONCLUSION
 
 61
 The Court of International Trade did not err in concluding that the Interim-Final Rule promulgated by NMFS is in accordance with the IDCPA. Neither did the Court of International Trade err in concluding that NMFS complied with NEPA. The decision of the court is therefore affirmed.
 
 
 62
 No costs.
 
 
 63
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 We refer to plaintiffs-appellants as "Plaintiffs."
 
 
 [2]
 The Secretary of Commerce delegated to the Assistant Administrator for Fisheries authority to make the administrative determinations at issue. The Secretary of State, Secretary of Treasury, and Commissioner of the United States Customs Service were named parties to the suit due to their potential involvement with the environmental assessment and their involvement with the Mexican embargo
 
 
 [3]
 Plaintiffs do not appeal the lifting of the embargo against Mexico
 
 
 [4]
 As noted, Plaintiffs have chosen not to appeal the portion of the Court of International Trade's decision regarding the lifting of the embargo against Mexico
 
 
 [5]
 Plaintiffs do not challenge the grant of authority in 16 U.S.C. § 1413(a)(2)(C). That issue, therefore, is not before us
 
 
 [6]
 This finding was issued by Commerce pursuant to 16 U.S.C. § 1385(g)(1)
 
 
 [7]
 The original standard allows tuna products that contain tuna harvested in the ETP to carry the dolphin safe mark if a certification accompanies the product stating that "no tuna were caught on the trip in which such tuna were harvested using a purse seine net intentionally deployed on or to encircle dolphins, and that no dolphins were killed or seriously injured during the sets in which the tuna were caught." 16 U.S.C. § 1385(d)(2) & (h)(2). The original standard is applied only if the tuna were caught on a trip commencing before the effective date of the initial finding by the Secretary or after the effective date of such initial finding, where the initial finding was that the intentional deployment on or encirclement of dolphins was having a significant adverse impact on any depleted dolphin stockId. § 1385(d) & (h).
 
 
 [8]
 40 C.F.R. § 1500.1(b) states that "[t]he information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." Moreover, section 1500.1(c) states that "NEPA's purpose is not to generate paperwork — even excellent paperwork — but to foster excellent action."
 
 
 [9]
 Plaintiffs argue that the tuna tracking forms utilized by Customs for verification purposes do not identify tuna that have been caught by encirclement, which is the unchanged labeling standard. Plaintiffs also argue that Mexican-brand tuna has illegally entered the United States in the past because Customs could not properly track the tuna. Whatever the merit of these concerns, Plaintiffs have failed to show how they establish error with respect to the environmental assessment that NMFS prepared
 
 
 [10]
 At oral argument, counsel for Plaintiffs stated that he was not arguing that the State Department should have prepared its own environmental assessment and environmental impact statement for the International Agreement, but that it should have participated in Commerce's process
 
 
 
 64
 PAULINE NEWMAN, Circuit Judge, concurring in part, dissenting in part.
 
 
 65
 At issue is the promulgation of regulations that directly contradict the provisions of the statute that authorizes them. The panel majority correctly holds that the agency erred in concluding that Congress was mistaken when it mandated that the fishing activity under consideration must stop one half hour before sunset. However, the majority then affirms the agency regulatory action on different grounds, not relied upon by the agency. Since this is not only a violation of administrative law, but an incorrect statutory interpretation, I respectfully dissent from that portion of the court's opinion that upholds the agency's regulation, and from the ensuing result.
 
 
 66
 * The statute was enacted to reduce the massive injury to the dolphin population by the purse seine method of tuna fishing. For some unknown reason, schools of tuna swim under schools of dolphins. When the dolphins are observed at the surface, they and the underlying tuna are herded together and encircled by a large and deep net, by means of speedboats, helicopters, and underwater explosives. The net is then closed to hold the entire catch. This is followed by a "backdown" procedure, to release those dolphins that have not drowned or been killed in the herding operation. The process is imperfect, and some of the released dolphins subsequently die of injuries sustained in the process, or are unable to re-establish contact with nursing calves, which then die. The amici curiae state that over seven million dolphins have died in purse seine tuna fishing.
 
 
 67
 The regulation in question was promulgated pursuant to 16 U.S.C. § 1413(a)(1) ("The Secretary shall issue regulations, and revise those regulations as may be appropriate, to implement the International Dolphin Conservation Program.") The statute requires that these regulations "shall include provisions ... ensuring that the backdown procedure during sets of purse seine net on marine mammals is completed and rolling of the net to sack up has begun no later than 30 minutes before sundown." 16 U.S.C. § 1413(a)(2)(B)(v) (emphasis added). Instead of implementing the statute, however, the regulations state that the backdown procedure must be completed "no later than 30 minutes after sundown." The regulation cannot be reconciled with the statute.
 
 
 68
 The government argues that Congress simply made a mistake in using the word "before" in the statute, and thus that the agency did not have to follow the statute. The Court of International Trade upheld the regulation on that ground. The panel majority correctly rejects this argument, for there is no evidence whatsoever that congressional intent was contrary to congressional enactment. See Garcia v. United States, 469 U.S. 70, 75, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984) (requiring "the most extraordinary showing of contrary intentions" to disregard the plain meaning of a statutory provision).
 
 B
 
 69
 However, the panel majority holds that the agency has discretion to ignore the statute. The court holds, sua sponte, that the statutory provision that "The Secretary may make such adjustments as may be appropriate to requirements of subparagraph (B) that pertain to fishing gear, vessel equipment, and fishing practices to the extent the adjustments are consistent with the International Dolphin Conservation Program," 16 U.S.C. § 1413(a)(2)(C), authorizes the Secretary to change the statutory "30 minutes before sundown" to "30 minutes after sundown" in the regulations. I cannot agree.
 
 
 70
 The Secretary was authorized only to make "such adjustments as may be appropriate," not to contradict a critical provision of the statute. Since the court agrees that "before sundown" was not a mistake, it cannot be "appropriate" or an "adjustment" to change it. When the statute clearly sets forth a provision, further "interpretation" is not only unnecessary, it is prohibited. See Chevron v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.") Here Congress could not be clearer, and there is no basis whatsoever for interpreting "30 minutes before sundown" to mean 30 minutes after sundown. That is not a "permissible" construction of the statute. Id. at 843, 104 S.Ct. 2778. See Regions Hospital v. Shalala, 522 U.S. 448, 457, 118 S.Ct. 909, 139 L.Ed.2d 895 (1998) ("If, by `employing traditional tools of statutory construction,' we determine that Congress' intent is clear, `that is the end of the matter,'") (quoting Chevron). The time to complete the backdown procedure was not left to agency discretion or interpretation, but was explicitly placed in the statute. It is a matter neither of interpretation or discretion. The intent of Congress was unambiguously stated as to "the precise question at issue." Chevron, 467 U.S. at 842, 104 S.Ct. 2778.
 
 C
 
 71
 The majority recognizes that this court is not free to affirm a discretionary agency action on grounds upon which the agency did not rely. See Securities & Exchange Comm'n v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947) (if the agency's grounds are improper, the court cannot affirm the administrative action by substituting other grounds). Since the Secretary's decision was based on the erroneous conclusion that Congress made a mistake, the court cannot rehabilitate the agency's action on some other ground. Fleshman v. West, 138 F.3d 1429, 1433 (Fed.Cir.1998), does not hold otherwise, for that case related to grounds not consigned to agency discretion and authority. Here, however, Congress granted the Secretary the authority only to "adjust" the provisions of 16 U.S.C. § 1413(a)(2)(B), not to countermand them in a major way.
 
 
 72
 The panel majority justifies the Secretary's departure from law by citing the Secretary's statement during the comment period that this change "is consistent with the International Agreement." A less favorable (to dolphins) time limit appears in the International Dolphin Conservation Program. However, this does not authorize the agency to override the statutory enactment.